HANNOLA, [EXRX.], APPELLANT, *v.*
CITY OF LAKEWOOD ET AL., APPELLEES.

(No. 39322—Decided March 27, 1980.)

*Sweeney, Mahon & Vlad Co., L.P.A.,* and *Mr. Robert E. Sweeney,* for appellant.

*Messrs. Weston, Hurd, Fallon, Paisley & Howley* and *Mr. Patrick J. Murphy,* for appellees.

KRENZLER, P. J. Plaintiff-appellant, Liisa Hannola, brought this action as executrix of the estate of her late husband, Paavo Hannola, against defendants-appellees Lakewood Hospital and the city of Lakewood, which may hereinafter be referred to as Lakewood Hospital; Milton J. MacKay, M.D.; and the West Shore Medical Care Foundation, Inc.

Liisa Hannola alleged that her husband died as a result of medical malpractice committed by appellees Lakewood Hospital and the city of Lakewood, Dr. MacKay, and West Shore Medical Care Foundation in the treatment provided Paavo Hannola in the Lakewood Hospital emergency room.

Appellees Lakewood Hospital and the city of Lakewood asserted that any acts of malpractice committed were the acts of independent contractors in that the emergency room of Lakewood Hospital was operated by West Shore Medical Care Foundation under contract with the hospital.

In a motion for summary judgment, appellee Lakewood Hospital restated this argument and indicated that the hospital does not practice medicine and did not undertake to treat Paavo Hannola. Appellees argued that physicians practice medicine; that the hospital did not control and had no right to control the care and treatment provided to Paavo Hannola by Dr. MacKay; and that Dr. MacKay and West Shore Medical Care Foundation, which hired the physicians for the hospital emergency room, were independent contractors for whose acts the hospital was not liable. The hospital and city attached the affidavit of Duane Horning, Administrator of Lakewood Hospital, in support of this motion.

Appellant opposed the motion upon the grounds that there were genuine factual issues as to whether the hospital had the right to control Dr. MacKay and West Shore Medical Care Foundation, and as to whether appellant and her late husband were induced to rely upon the appearance that Dr. MacKay was an agent of Lakewood Hospital. In support of her arguments, appellant attached a copy of the contract between Lakewood Hospital and West Shore Medical Care Foundation and her own affidavit.

The trial court granted the appellees' motion for summary judgment as to Lakewood Hospital and the city of Lakewood. Pursuant to Civ. R. 54(B), the court found no just reason for delay and entered final judgments in favor of these two defendants.

Appellant appeals this decision and asserts as her assignment of error that the trial court erred in granting summary judgment. Within this single assignment of error, appellant raises the following issues for our consideration:

"I. The trial court erred in granting defendants' motion for summary judgment, where there was a clear, genuine issue of material fact as to whether defendants-appellees controlled or had the right to control defendants, Dr. Milton MacKay and the West Shore Medical Care Foundation, and where there was a clear issue as to the hospital's independent duty to appellant to prevent physician's malpractice.

"II. The trial court erred in granting defendants' motion for summary judgment, where there was a clear, genuine issue of material fact as to whether appellant and the decedent were induced to rely upon the appearance that Dr. MacKay was an agent of Lakewood Hospital."

The essential question for our consideration is whether a hospital may insulate itself by contractual arrangement from liability for acts of medical malpractice committed in an emergency room upon its premises.

We shall first consider appellant's second issue within her one assignment of error.

Civ. R. 56(C) requires that evidence shall be construed most strongly in favor of the party against whom a motion for summary judgment is made. With that requirement in mind, we note that the affidavit of appellant Liisa Hannola indicates that she had knowledge of the reputation of Lakewood Hospital as an institution providing medical care of the highest quality; that she and her late husband sought treatment at Lakewood Hospital's emergency room because of Lakewood Hospital's reputation for the highest quality of medical care and particularly for the highest quality of emergency room care; and that she was induced to seek care from Dr. MacKay in the emergency room relying upon the reputation of Lakewood Hospital and the appearance in the emergency room that Dr. MacKay was an employee of the hospital.

On the other hand, Lakewood Hospital had an agreement with West Shore Medical Care Foundation whereby the Foundation hired physicians and provided all the services of physicians for the emergency room of the hospital. The agreement also contained a provision that the hospital shall not be liable for injury or damages to any person by reason of any acts or omissions of physicians employed by the Foundation. We shall consider the agreement in more detail below. The Foundation billed patients directly for professional services rendered by physicians employed by the Foundation.

In the case of *Rubbo* v. *The Hughes Provision Co.* (1941), 138 Ohio St. 178, the Ohio Supreme Court held as follows at paragraph one of the syllabus:

"Where the proprietor of a provision market advertises an article for sale in his market and a purchaser, in reliance that he was buying from such proprietor and without knowledge to the contrary, buys such advertised article at a counter in the market which the proprietor had leased to another, which counter was the only place in the market where the article in question was to be found, the doctrine of agency by estoppel applies, and in an action against such proprietor for injuries resulting from such sale, the proprietor will not be heard to deny that the lessee of the counter space was proprietor's agent."

The Ohio Supreme Court further explained the doctrine of agency by estoppel in the case of *Johnson* v. *The Wagner Provision Co.* (1943), 141 Ohio St. 584, at paragraph four of the syllabus:

"The doctrine of agency by estoppel, as it might be invoked by a plaintiff in a tort action, rests upon the theory that one has been led to rely upon the appearance of agency to his detriment. It is not applicable where there is no showing of induced reliance upon an ostensible agency."

Lakewood Hospital held itself out as a full-service hospital. As a full-service hospital, its facilities included emergency room facilities. The public was not aware, nor was it effectively told, that the hospital's emergency room facilities were operated by an independent contractor and that the emergency room was no longer considered part of Lakewood Hospital.

By calling itself a "hospital" and by being a full-service

hospital including an emergency room as part of its facilities, an institution makes a special statement to the public when it opens its emergency room to provide emergency care for people. In essence, an agency by estoppel is established by creating an effect: that is, the appearance that the hospital's agents, not independent contractors, will provide medical care to those who enter the hospital. The patient relies upon this as a fact and he believes he is entering a full-service hospital.

The agency by estoppel created by the institution purporting to be a hospital is somewhat different than the narrow definition provided by *Rubbo, supra.* In that case, public advertisements disclaiming agency might have insulated the unwilling principals. The people who relied on the ostensible agency might have acted differently with knowledge that there was no actual agency. Here, we are faced with the situation of injured or ill patients in need of emergency medical treatment. Realistically, a person has no meaningful choice under the circumstances. He needs treatment and will turn to his local hospital to provide it regardless of prior notice that the physicians are independent contractors. The patient thinks of "Lakewood Hospital" in his time of need, not the West Shore Medical Care Foundation.

Further, sound public policy demands that the full-service hospital not be permitted to contractually insulate itself from liability for acts of medical malpractice committed in its emergency room. First, the emergency room is an integrally related part of the full-service hospital. The hospital may not pretend that this essential element of its public service treatment facilities is a separate entity. Moreover, the nature of the situation when people turn to the hospital and its emergency room facilities for treatment is one fraught with crisis. People are often highly emotional. There is frequently no time to choose. Indeed, time is of the essence. The chances of going elsewhere for treatment are remote. Given the relationship of the emergency room to the full-service hospital and the crisis circumstances under which people seek emergency treatment, public policy requires that the hospital not be able to artificially screen itself from liability for malpractice in the emergency room.

Therefore, we hold that when an institution purporting to be a full-service hospital makes emergency room treatment

available to serve the public, the hospital will be estopped to deny that the physicians and other medical personnel on duty providing treatment are its agents. Regardless of any contractual arrangements with so-called independent contractors, the hospital will be liable to the injured patient for the acts of malpractice committed in its emergency room, assuming proximate cause and damage are present.

This analysis is consistent with what the public expects when it goes for emergency treatment at a hospital. As stated in the Note, Independent Duty of a Hospital to Prevent Physicians' Malpractice, 15 Ariz. L. Rev. 953, 967 (1973):

"The image of modern hospitals as centers of medical practice of the highest quality is understandably cultivated by the hospitals themselves. Nonprofit hospitals do not, of course, advertise as such. But they do maintain a high degree of 'visibility' in the community through fund-raising campaigns, community relations programs, public service programs, press releases and the like, all presenting the hospital as a unified institution vital to community health, rather than as a mere physical shell in which private physicians practice their profession.

"* * *

"The public, however, has been led to accept its image of the hospital as the correct one; it relies on this image in its willingness to make use of hospital facilities. Public outrage, and possibly even an effect on admissions at a typical hospital, would surely follow a public announcement by the hospital that it regards all staff doctors as completely independent professionals, conducts no supervision of their performance and takes no interest in their competence. The public assumes, correctly or not, that the hospital exerts some measure of control over the medical activities taking place there."

In the instant case, appellant took her husband to the emergency room of Lakewood Hospital for emergency treatment, relying upon the fact that this was an institution holding itself out as a hospital and relying upon the excellent reputation of the hospital. Appellant did not choose to go to West Shore Medical Care Foundation. Under the circumstances, appellees are estopped to deny that Dr. MacKay, who treated the husband in the hospital emergency room, was an agent of the hospital.

For the above reasons, appellant's second issue within her single assignment of error is well taken. The trial court did err in dismissing the case against appellees by granting summary judgment where there were issues of material fact as to whether appellant relied upon Dr. MacKay's appearance as an agent of the hospital.

Two other grounds asserted as part of appellant's assignment of error include the issue of whether appellees could control Dr. MacKay and the West Shore Medical Care Foundation, and whether the hospital had an independent duty to prevent the physician's alleged malpractice. Appellant argues that there were issues of fact as to the control question and a "clear issue" as to the hospital's independent duty to prevent physicians' malpractice.

In the case of *Klema* v. *St. Elizabeth's Hospital of Youngstown* (1960), 170 Ohio St. 519, the Ohio Supreme Court held as follows at paragraph two of the syllabus:

"A corporation not for profit, which has as its purpose the maintenance and operation of a hospital, is, under the doctrine of *respondeat superior,* liable for the negligent acts of its employees, irrespective of whether those acts are administrative or medical."

The Ohio Supreme Court further stated in the case of *Sears* v. *Cincinnati* (1972), 31 Ohio St. 2d 157, at paragraph three of the syllabus:

"Under the doctrine of *respondeat superior* a municipal corporation is liable to a party injured by the negligence of an employee of a hospital owned by the municipality."

The issue in the instant case then is whether Dr. MacKay and West Shore Medical Care Foundation are "employees" of the hospital justifying the application of the doctrine of *respondeat superior* such that the hospital may be liable for their negligent acts. In the case of *Councell* v. *Douglas* (1955), 163 Ohio St. 292, the Ohio Supreme Court held that control was the essential element to justify liability for the master in a master-servant relationship in the first three paragraphs of the syllabus:

"The relationship of principal and agent or master and servant is distinguished from the relationship of employer and independent contractor by the following test: Did the employer retain control of, or the right to control, the mode

and manner of doing the work contracted for? If he did, the relationship is that of principal and agent or master and servant. If he did not but is interested merely in the ultimate result to be accomplished, the relationship is that of employer and independent contractor.

"The rule of *respondeat superior* only arises out of the relationship of superior and subordinate and ceases when that relationship ceases to exist; and the reason of it is to be traced to the power of control and direction, which the superior has a right to exercise, and which, for the safety of others, he is bound to exercise, over the acts of his subordinates. (Paragraph four of the syllabus of *Clark* v. *Fry,* 8 Ohio St., 358, approved and followed.)

"Where one employs another to do certain work for him, the mere right reserved by the employer to direct as to the quantity of work to be done, or the condition of the work when completed, is not a right to control the mode or manner of doing the work so as to justify the conclusion that the relationship between the employer and the contractor is either that of principal and agent or master and servant. (Paragraph four of the syllabus in *Hughes* v. *Railway Co.,* 39 Ohio St., 461, approved and followed.)"

In the instant case, appellees essentially argue for a narrow interpretation of control as being control of diagnosis and treatment of patients. The implication of appellant's arguments is a broader interpretation of control as being the control of personnel and patient care policy. While the hospital administrator, Duane Horning, denied that the hospital had a right of control over Dr. MacKay, appellant points to the agreement between the hospital and the West Shore Medical Care Foundation to indicate that there was at least enough control to create a material issue of fact to survive a motion for summary judgment. Our analysis of this agreement leads us to agree with appellant.

In the agreement between the hospital and West Shore Medical Care Foundation, there is one very significant provision which indicates that the hospital did have the right to control the mode and manner of the work done in the emergency room. Paragraph No. 7 of the agreement requires that physicians employed by the West Shore Medical Care Foundation must apply for and obtain appointment as members of the

Medical Staff of Lakewood Hospital and that the staff privileges of West Shore Medical Care Foundation physicians may be revoked for cause upon recommendation of the Medical Staff of the hospital, subject to the appeals procedure in the By-laws of the Medical Staff. This borders on giving the hospital the power to dismiss the physicians, much as an employer has the right to fire an employee.

Moreover, paragraph No. 19 of the agreement indicates that matters of policy regarding patient care may be established by the Board of Trustees of the West Shore Medical Care Foundation *with the approval* of the Executive Committee of the Medical Staff, the Administration and the Board of Trustees of the Hospital.

By presenting the above provisions of the agreement, appellant did present enough facts to raise an issue as to whether Dr. MacKay was under the control of the hospital to justify the imposition of liability upon the hospital under the doctrine of *respondeat superior.*

Finally, appellant has raised the issue of the hospital's independent duty to prevent a physician's malpractice. A hospital clearly does have a duty to prevent a physician's malpractice at least to the extent that it establishes procedures for the granting of staff privileges and for the review of these privileges. *Purcell* v. *Zimbelman* (1972), 18 Ariz. App. 75, 500 P. 2d 335; *Mitchell County Hospital Authority* v. *Joiner* (1972), 229 Ga. 140, 189 S.E. 2d 412. Given the unique nature of an emergency room and the public's lack of meaningful choice in a dire medical emergency, a hospital may well have a more specific and precise independent duty in the emergency room than in other parts of the hospital to monitor the treatment procedures and medical care provided patients. Where, as here, appellant asserts that the hospital was negligent in the care provided in its emergency room to Paavo Hannola, we believe that there are issues of material fact to be resolved as to whether the hospital breached its higher independent duty of monitoring the patient care offered in its emergency room. On the issues of control and the hospital's independent duty to control physicians' malpractice, appellant's assignment of error is well taken.[2]

---

[2] Appellees are contending that whenever a hospital emergency room is operated by an independent contractor, the hospital is not liable for the negligence of the inde-

For the above reasons, the judgment of the Court of Common Pleas of Cuyahoga County is reversed and the cause remanded for further proceedings consistent with this opinion.

*Judgment reversed and cause remanded.*

PRYATEL and DAY, JJ., concur.

---

pendent contractor's employees as a matter of law. Appellees rely on the case of *Cooper* v. *Sisters of Charity* (1971), 27 Ohio St. 2d 242.

In *Cooper*, the Emergency Professional Service Group, a third party, entered into an agreement with the Good Samaritan Hospital to run the emergency room of the hospital. Dr. Hansen, an employee of the Emergency Professional Service Group, treated plaintiff's son and the boy died. Plaintiff brought an action against the Sisters of Charity of Cincinnati, Inc., which operated the hospital; the Emergency Professional Service Group; Richard Weber, that group's co-director; and Dr. Hansen. At the close of plaintiff's case, the trial court granted defendants' motion for a directed verdict. The Supreme Court affirmed the directed verdict on the basis that the evidence was insufficient to make a jury question of proximate cause for determining negligence. In addition, in dicta, the Supreme Court said that if Hansen had been negligent, the Sisters of Charity, the operators of the hospital, would not have been liable because Hansen was not under the control of the hospital; the mere practice of medicine in a hospital does not create an agency by estoppel; and induced reliance was not shown by plaintiff.

In contrast, the instant case comes to us on the granting of a pretrial motion for summary judgment. Here, there remain significant issues of fact to be determined on the questions of control, induced reliance and the hospital's independent duty of care. Thus, summary judgment was improperly granted.

Further, the *Cooper* court did not consider the public policy issues that we are considering in the instant case. These public policy issues include the hospital's special independent duty in the emergency room on its premises and the problem of the full-service hospital and patients' induced reliance on the reputation of the hospital with an emergency room on the premises. Of course, we fully agree that the mere practice of medicine by a licensed physician in a hospital is not sufficient to create an agency by estoppel.