471 So.2d 358 (1985)
Mrs. Annie Theresa HARDY, Administratrix of Estate of Brad Emmitt Ewing, Deceased, Appellant,
v.
Terry BRANTLEY, M.D. and Hinds General Hospital, Appellees.
No. 54806.
Supreme Court of Mississippi.
May 22, 1985.
Rehearing Denied July 10, 1985.
*359 L. Joe Lee, James B. Grenfell, Lee & Grenfell, Jackson, for appellant.
*360 George Q. Evans, Douglas E. Levanway, Wise, Carter, Child & Caraway, Louis G. Baine, Baine & Moore, Jackson, for appellee.
En Banc.
ROBERTSON, Justice, for the Court:

I.
Evidence in this medical malpractice action reflects that practically no one ever dies of a perforated duodenal ulcer, but Brad Ewing did. The testimony also suggests that detection of a perforated ulcer is a relatively straight forward diagnosis provided the proper tests are run, but an emergency room physician misdiagnosed Brad Ewing's condition following which Brad died.
Because of outmoded rules we have finally dispatched in Hall v. Hilbun, 466 So.2d 856 (Miss. 1985), Brad Ewing's personal representative was denied a fair opportunity to prove a claim of malpractice against the emergency physician and the hospital. We reverse and remand for a new trial under the Hall principles. Beyond that we clarify our law regarding the liability of a hospital for the malpractice of its emergency physician and provide that under certain circumstances the hospital may incur vicarious liability under the theory of respondeat superior.

II.

A.
On the morning of September 10, 1980, Brad Emmitt Ewing, at that time an unmarried 35 year old resident of Jackson, Mississippi, began to experience severe stomach pains. He was taken by his brother, Larry Ewing, to Hinds General Hospital Emergency Room in Jackson. At this time, Brad was practically doubled over with pain in his abdomen. Larry Ewing testified that he and Brad did not seek the services of any particular physician.[1] Rather, they sought emergency care from whatever health care personnel Hinds General had available as Brad was in great pain.
Larry checked Brad in at the front desk at Hinds General, giving the clerk the needed information about his brother. Larry then helped his brother into the emergency room where Brad was treated by Dr. Terry K. Brantley, an emergency services physician. Dr. Brantley took Brad's blood pressure and ordered various blood tests. Brad's blood pressure was slightly elevated and his white blood count, 14,300, was above the upper limits of normal, 10,000-11,000. Dr. Brantley requested a urinalysis although it appears that this test was never performed. Dr. Brantley also failed to check Brad's stool, and he failed to order an x-ray examination of the lower and upper abdomen of the deceased.
Apparently, Dr. Brantley concluded that Brad was suffering from heat exhaustion. He put him on an IV and gave him Tylenol and Valium. Brad remained at the hospital for approximately four hours. Prior to his release at approximately 6:00 p.m., Dr. Brantley took Brad's blood pressure again, and again the results were somewhat high. However, during his stay at the emergency room, Brad's condition seemed to improve. His pain in the abdomen became less severe, no doubt aided by the Tylenol and Valium, and he was dismissed with a prescription for Darvon Compound 65 for pain and with instructions to drink large quantities of liquids such as Gatorade, orange juice, etc.
Certain facts regarding this initial visit are in conflict. The history of the patient *361 as shown on the hospital record reveals that he had been out working in the fields in the hot sun prior to his hospital visit.[2] His brother Larry claims that, prior to the visit, he and his brother had been lying on the couch watching T.V. Larry denies ever having told anyone at the hospital that his brother had been in the hot sun. The other fact in conflict is whether, as Dr. Brantley claims, he told Brad if he had any further problems to contact his own physician. Again, Brad's brother, Larry, denies this. Finally, there is some question as to whether Brad complained of pains in his extremities, especially his legs, as the hospital report shows.
Following his initial visit to the Hinds General emergency room, Brad rested fairly well the night of September 10, 1980. However, on the afternoon of September 11, 1980, he again began to experience steady and intense abdominal pain. Larry took Brad back to Hinds General Hospital, and shortly thereafter, Brad Ewing expired. The cause of death noted on the hospital records is cardiorespiratory arrest.
An autopsy report was requested by the Hinds County Coroner and was performed by Dr. Rodrigo Galvez. Dr. Galvez concluded that Brad was suffering from a perforated duodenal ulcer and peritonitis which caused his death. Dr. Galvez said that it was his opinion that Brad had been suffering from this condition for approximately 48 to 72 hours prior to his death.
Dr. Galvez also testified that he had performed over 2,000 autopsies and had never performed an autopsy where someone had died from a perforated duodenal ulcer. He said that people did not normally die from this condition since it was easily diagnosed and treatable. Dr. Galvez expressed no opinion as to whether Dr. Brantley had been negligent, nor was he asked.

B.
The record reflects that Dr. Terry K. Brantley is one of three physicians organized as The Hinds Emergency Group (HEG). At all relevant times, Dr. Brantley served as an emergency physician at Hinds General in accordance with a rather elaborate contract between Hinds General and HEG.
The contract provides that HEG shall have the complete and sole responsibility for furnishing professional services in the Emergency Department of... [Hinds General] so as to provide twenty-four hour coverage.
HEG was obligated to provide an emergency physician to render emergency care to each patient presenting himself at the emergency room, except patients known to have their own private physician.
Fees for services rendered by HEG were to be determined by HEG subject to review by Hinds General's administrator. The Hinds General accounting department was charged administratively with all billings and collections on behalf of HEG, for which services HEG paid to Hinds General 20 per cent of all such billings.
HEG agreed that during the term of the agreement none of its physicians would maintain an office for the private practice of medicine other than in the Emergency Department of the hospital and
that they [HEG physicians] will confine their practice to emergency coverage at this Hospital; . ..,
except as otherwise expressly authorized by Hinds General's administrator.
Significantly, the contract then provided:
10. Disclaimer. In this performance of the work, duties and obligations devolving upon him under this agreement, it is mutually understood and agreed that The Hinds Emergency Group is at all times acting and performing as an independent *362 contractor providing to the Hospital the services of Emergency Physicians who are practicing their profession in medicine and surgery and specializing in Emergency care. The Hospital shall neither have nor exercise any control or direction over the methods by which the Hinds Emergency Group or its contract physicians shall perform their professional work and functions; the sole interest and responsibility of the Hospital is to ensure that the Emergency Department and service covered by this agreement shall be performed and rendered in a competent, efficient, and satisfactory manner. The standards of medical practice and professional duties of the partners and the contract physicians of the Hinds Emergency Group shall be determined by the medical staff of the Hospital. All applicable provisions of law and other rules and regulations of any and all governmental authorities relating to licensing and regulations of Physicians and Hospital and to the operation of the department shall be fully complied with by all parties hereto; in addition, the parties shall also operate and conduct the department in accordance with the standards and recommendations of the Joint Commission on Accreditation of Hospitals, the bylaws of the Hospital, and the bylaws, rules and regulations of the medical staff as may be in effect from time to time. Nothing in this agreement shall be in any way construed to constitute The Hinds Emergency Group or the Emergency Physicians as agents or employees of the Hospital, nor shall anything contained herein be construed to constitute the Hospital as agent for The Hinds Emergency Group or the Emergency Physicians except as specifically provided for in respect to billing and collection matters set forth in Paragraph 2 above.
11. Liability Insurance. The Hinds Emergency Group shall at its own expense or at the expense of its Emergency Physicians, cause each of its Emergency Physicians to carry professional liability insurance to cover himself, with a minimum of $100,000.00 for each person and $300,000.00 for each incident.
12. Indemnity. The Hinds Emergency Group shall defend, indemnify and hold Hospital, its Board of Trustees, employees and agents harmless from and against any and all claims, demands, liabilities, damages and expenses for injury to persons or damage to property caused or asserted to have been caused by the negligent or intentional acts of The Hinds Emergency Group or its employees, agents or partners. [Emphasis supplied]
There is no evidence in the record that Brad or Larry Ewing had any knowledge of this agreement or its terms.

C.
Procedurally, this civil action was commenced on March 19, 1981. On that day Mrs. Annie Theresa Hardy, Administratrix of the Estate of Brad Emmitt Ewing, deceased, filed her declaration in the Circuit Court of the First Judicial District of Hinds County, Mississippi, invoking the provisions of the Mississippi Wrongful Death Act, Miss. Code Ann. § 11-7-13 (Supp. 1984). Named as Defendants, among others, were Terry K. Brantley, M.D., and Hinds General Hospital, a community hospital situated in the First Judicial District of Hinds County. Plaintiff Hardy charged negligence on the part of the Defendants in the diagnosis and treatment of her son, Brad Emmitt Ewing; this negligence was said to have caused or contributed to Brad's death. In their separate answers, the Defendants denied the operative allegations of the declaration.
In the course of discovery the Defendants became aware that Plaintiff intended to call as an expert witness Dr. Frederic G. Ransom, a specialist in emergency medicine from Birmingham, Alabama, and in that connection Defendants filed on July 22, 1982, a motion in limine wherein they asserted that Dr. Ransom was not competent under our law to testify as an expert witness in such cases. By order entered August 4, 1982, the motion was overruled.
*363 Defendant's motion in limine was renewed on December 29, 1982, in the wake of this Court's then recent decision in King v. Murphy, now reported in 424 So.2d 547. On January 6, 1983, the renewed motion was overruled, subject to the right of Defendants to question Dr. Ransom on voir dire regarding his competency as an expert witness in the case.
On January 10, 1983, this matter was called for trial in the Circuit Court sitting in Jackson, Mississippi, Honorable Charles T. Barber, Circuit Judge, presiding and sitting with a jury.
The outcome-determinative event at trial was Plaintiff's attempt to present the testimony of Dr. Ransom. After extensive voir dire examination, the Circuit Judge ruled that Dr. Ransom could not testify and stated that he was of the opinion that Dr. Ransom
does not possess the standards as outlined in the last decision [King v. Murphy] I have before me at this time and therefore I am going to sustain the motion in limine.
This ruling was not otherwise explained.
In due course thereafter, the Plaintiff rested her case and both Defendants moved for a directed verdict. The trial judge granted each motion and on January 14, 1983, entered a final judgment dismissing with prejudice the declaration of Plaintiff against both Dr. Brantley and Hinds General Hospital. This appeal has followed.

III.

A.
Our first concern is whether the trial judge correctly excluded the testimony of Dr. Ransom. At the outset of our consideration of this question, we note Dr. Ransom's professional qualifications and background as they are reflected in the record.
Dr. Ransom graduated from Morehouse College in Atlanta, Georgia in 1968. Thereafter, he attended the University of Alabama School of Medicine. His internship and his residency in internal medicine were taken at University of Alabama Hospitals in Birmingham, Alabama. He was certified by the American Board of Internal Medicine in June of 1975. Currently he serves as the medical director of the University Emergency Department at University of Alabama Hospitals. He also serves on boards of directors or as a member or instructor for numerous other health-related organizations. He has never practiced medicine anywhere other than Alabama.
Dr. Ransom had been engaged in the practice of emergency medicine for seven years on a full-time basis. In that time, he has supervised about 250 interns and residents. A fair number of those people originally trained in Mississippi and several are now in practice in the state of Mississippi. Some of the patients Dr. Ransom has treated have come from the eastern portion of the state of Mississippi, and he has occasionally interacted with doctors in Mississippi regarding transfers and the like.
During the seven years of his practice, Ransom participated in continuing education programs on a nationwide and regional basis and many of the programs included doctors from Mississippi. He has had the occasion to talk with them about medical issues generally and more specific matters relating to their practice of emergency medicine. One of the continuing education activities that Dr. Ransom has been involved in is the Southeastern Conference on Emergency Medicine, which includes emergency physicians from all the states in the southeast including Mississippi.
On cross-examination, it was established that Dr. Ransom knew there were approximately eight or nine hospitals in Jackson. He did not know how many emergency rooms there were, nor did he know how many emergency rooms had full-time physicians. He did not know how many beds Hinds General Hospital had nor did he know its equipment in specific detail. In fact, Dr. Ransom had never been to Hinds General Hospital nor had he seen its laboratory facilities or known what its laboratory capabilities were. He had never consulted a physician concerning treatment *364 of a patient in Hinds County. He had no personal knowledge of how complaints of abdominal pain such as that suffered by Brad Ewing had in fact been treated by emergency room physicians in Hinds County.
Dr. Ransom testified that, in terms of approaching diagnostic problems, there is no substantial difference in the practice of emergency room physicians between Tallahassee and Jackson and Birmingham and Pascagoula. In other words, it was Dr. Ransom's opinion that as far as Brad Ewing's particular problem was concerned, the diagnostic procedures that should have been followed were the same nationwide. He was confident that the approach to patients with acute abdominal pain was the same in Jackson, Mississippi and Birmingham, Alabama. He said that, in emergency medicine as in other fields, there are certain standard procedures and references that are available to physicians and medical students nationwide, and that based on his own experience diagnostic procedures in cases of acute abdominal pain are among those standardized procedures.
At the close of voir dire, the parties stipulated that the population of Birmingham, Alabama, is 280,000 people and that the population of Jackson, Mississippi, is approximately 250,000. Following this, the trial judge refused to allow Dr. Ransom to testify finding that he "did not possess the standards as outlined in the last decision" [King v. Murphy] from this court.
After this ruling, the plaintiff made a question and answer proffer of Dr. Ransom's testimony. Dr. Ransom testified that decision-making in an emergency room is the same regardless of the complaint and that it certainly applied to patients with abdominal pains. He said that, first, the physician must determine whether the patient is in jeopardy of immediate loss of life. Next, the physician should ask if the patient has something that needs immediate intervention. This Dr. Ransom felt was relevant to Brad Ewing's complaints of abdominal pains. Finally, the physician must decide whether the patient has something that needs hospitalization for further evaluation and treatment, whether the patient needs follow-up or whether the patient has something that can be treated by another method and finally released.
Dr. Ransom testified that whenever a patient comes in with acute abdominal pain, i.e., pain of recent onset, a physician should obtain a complete history and perform a physical examination. There were some critical elements that he felt had to be included in these procedures that were sadly lacking in Brad Ewing's case. Dr. Ransom said that the patient history should have included a history of present illness, how the pain came about, its duration, its intensity, exactly where it is, and how it manifests itself, i.e., is it intermittent or constant. Dr. Ransom felt that the patient should have been asked whether he was suffering from fever, nausea, vomiting, diarrhea or constipation in addition to the pain. He felt that a history of past illnesses would have been useful, as would some knowledge of medication or drugs that the patient might be on. He observed that in this case, no one even took Brad Ewing's temperature until after Tylenol had been administered.
Dr. Ransom further gave his opinion that the following tests should be systematically run on a patient presenting severe abdominal pains. First, he said that a complete blood count should be taken and this was done. A urinalysis should be done. For reasons not adequately explained in the record, this test was not run. He said that an amylase count (amylase is a chemical or an enzyme in the blood which can reflect disease of the pancreas) should be obtained, especially when as in this case there are some elements in the record that raise the possibility of alcohol being involved. He felt that a stool check for occult blood is important. Finally, he said that an x-ray examination of the flat and upright abdomen should be performed. None of these last three diagnostic procedures appears to have been performed.
It was Dr. Ransom's opinion when a patient comes in with severe abdominal *365 cramps, there are basically three possibilities that an emergency room physician should pursue. (1) He should investigate whether the patient has perforated, i.e., ruptured, a hollow organ. One should then discern whether the patient is (2) bleeding or (3) obstructed, i.e., having blockage in his intestines or some other internal organ. Ransom said that the three tests which would have answered these questions were the amylase count, the stool check for occult blood and the plain films of flat and upright abdomen. These were precisely the three tests which were not performed.
As far as the vital signs that were taken, Dr. Ransom found nothing that would help an emergency room physician make the correct diagnosis. However, he opined that if the correct tests had been performed, there was a 100% chance of making a correct diagnosis of a perforated ulcer. Dr. Ransom also said that there was nothing inconsistent with the patient's improvement and the possibility of a perforated ulcer. First, he noted that pain relieving compounds were given (although the record is not clear that these were of sufficient strength to have relieved severe abdominal pains by themselves). Second, he said that it is well recognized, in terms of the sequence of development of symptoms with perforated ulcer, that there is an initial stage of shock where a patient has a sudden onset of pain and then there is a reaction stage where the abdomen becomes board-like. Between the onset or initial stage of shock and the reaction, there is often a lull period where the patient seems to improve even to the point where he is convinced that his symptoms are subsiding. He said that the length of the lull period is a function of the size of the leak. With a small leak, he said that the lull period could last from six to twelve hours during which time the patient's vital signs  blood pressure, pulse, temperature  might be normal. He said that, in order not to be deceived by these kinds of developments, it is necessary to do routine abdominal films to discern whether there is anything in the abdomen indicating perforation. He said that as many as one-third of the people who have perforated ulcers will not have a typical sudden onset of pain followed immediately by a board-like abdomen, shock, and all the things that make it easy to recognize that one needs immediate surgery.
When asked whether the information that was available to Dr. Brantley supported a diagnosis of heat exhaustion, Ransom replied that heat exhaustion is a diagnosis of exclusion, and that, if a person has abdominal pain because of heat cramps, then there would be some abdominal rigidity because a cramped muscle is tense as it is in a spasm. His review of the record convinced him that the abdominal musculature of Brad Ewing was not tense at all.
Finally, Dr. Ransom cited several medical authorities which characterized perforation as one of the easiest diagnoses to make. These authorities say that diagnostic accuracy and skill with regard to perforation should be 100%. He testified further that a 100% diagnostic rate was highly unusual as medicine is an inexact science.
In summary, Dr. Ransom was of the opinion that the history of the patient that was taken was highly improper, that the proper tests were not run, and that in substantial part because of these omissions a proper diagnosis was not made. He felt that the quality of emergency health care rendered Brad Ewing was below minimally acceptable standards, and negligently so.

B.
The facts before us, we address the law with respect to whether the trial court correctly excluded the testimony of Dr. Ransom. We note at the outset that this matter has been wholly preserved by Plaintiff in accordance with the requirements of Dazet v. Bass, 254 So.2d 183, 187-188 (Miss. 1971), to-wit: Plaintiff offered into the record a comprehensive description of Dr. Ransom's education, training, experience, and qualifications. Dr. Ransom was then subjected to extensive voir dire cross-examination by counsel for Defendants, following which the substance of the testimony *366 Plaintiff would have presented to the jury was placed in the record in question and answer form. See Murray v. Payne, 437 So.2d 47, 55 (Miss. 1983).
As in all cases where expert opinion evidence is offered, our initial inquiry is whether the subject matter of the proffered testimony is of the sort with respect to which expert opinion evidence will be of assistance to the trier of fact. House v. State, 445 So.2d 815, 822 (Miss. 1984). Without in any way approaching the outer limits of this rule, it is safe to say that medical malpractice cases generally require expert opinion evidence from qualified expert witnesses to assist the trier of fact to understand the evidence. Hall v. Hilbun, 466 So.2d 856, 873 (Miss. 1985); Kilpatrick v. Mississippi Baptist Medical Center, 461 So.2d 765, 768 (Miss. 1984); Hawkins v. Ozborn, 383 F. Supp. 1389, 1395 (N.D.Miss. 1974).
An integral part of this initial inquiry is whether, in the words of House v. State, 445 So.2d 815 (Miss. 1984)
The field of expertise [is] one in which it has been scientifically established that due investigation and study in conformity with techniques and practices generally accepted within the field will produce a valid opinion.
445 So.2d at 822.
Again, we may take judicial notice that the field of medical science is such a "field of expertise".
The next inquiry for the trial court and for this Court on appeal is whether the witness is qualified. After the trial judge has determined that expert testimony will be of assistance to the trier of fact, our law requires that he or she then determine whether the witness sought to be presented is "qualified as an expert by knowledge, skill, expertise, training or education". Hall v. Hilbun, 466 So.2d at 873. Our law requires that an expert witness be qualified in fact before he or she may provide opinion evidence, although necessarily this determination involves the exercise of a certain amount of discretion on the part of the trial judge. Hall v. Hilbun, 466 So.2d at 875; Pharr v. Anderson, 436 So.2d 1357, 1359 (Miss. 1983). Suffice it to say that the trial judge should seek to assure that the proffered witness really is an expert in the area in which his opinion testimony is offered.[3]
Here there is no serious question but that Dr. Ransom meets the test. He received his medical degree from the University of Alabama in 1972, completed a three year residency in internal medicine and was Board-certified by the American Board of Internal Medicine in June of 1975. Since that time the great bulk of his professional activities have been in the field of emergency medicine, primarily in association with the University of Alabama Medical Center in Birmingham and several community hospitals in surrounding Jefferson County, Alabama. He appears to have held every office one can hold in the Alabama Chapter of the American College of Emergency Physicians and to have participated extensively within the Southeastern United States in continuing education in the field of Emergency Medicine. In brief, Dr. Ransom is a qualified expert for purposes of giving an opinion regarding medical problems of the sort we are concerned with in this action.
Plaintiff offered the expert opinion testimony of Dr. Ransom in support of her charge of malpractice in the care and treatment of Brad Ewing on the part of Dr. Brantley and the Hinds General Hospital in four general areas: (1) the history obtained with regard to the patient, (2) the physical examination, (3) the diagnostic testing, and (4) the diagnosis made on the basis of the history and diagnostic tests. We consider whether Dr. Ransom was qualified to offer an opinion in these areas under the guidelines we have announced in Hall v. Hilbun, 466 So.2d 856.
*367 First, what history should be obtained is a matter within the realm of general medical knowledge, skill and competence with respect to which a qualified expert may testify and express an opinion without more consistent with Hall v. Hilbun. In this regard, Dr. Ransom testified
A. I think that there certainly are well developed guidelines for taking a history and recording it. Basically, it ought to include a history of present illness, which basically would characterize the onset of the pain, abrupt, gradual; the duration of the pain; some description of the intensity of the pain, and that certainly is noted here. I think there are many other factors that are involved. It ought to talk about where the pain was at the beginning, whether it has spread, whether it radiates  that is the medical term for "goes to other areas"  there ought to be, ideally, some description of things that make it better or worse. I think there should be an effort to characterize it as cramping or steady or constant. I think that associated symptoms is something you'd expect to see in the way of asking the patient about the association of fever, nausea, vomiting, diarrhea, constipation. I think there are a number of historical elements that ought to be included. I think the other bit of history that is lacking and which is certainly conventionally included in these kinds of records is past medical history. It is certainly significant in evaluating a patient with abdominal pain as to whether he's had episodes like this before, whether there is a history of ulcer disease, whether he's on some medication that might cause irritation  alcohol is a big one  aspirin and aspirin containing drugs is a big one  whether he's had previous abdominal surgery. I think that is an important issue. I think it ought to be clear; that the standard of practice ought to address in a substantive fashion these issues, both with respect to what we refer to as pertinent positives and pertinent negatives. That means it may be very significant if the patient has not had previous surgery; that he did not have associated nausea; that he did not have associated bleeding from his bowels or in his vomitus. I think these are the issues that, certainly, Emergency Department records should incorporate.
By reference to the medical records regarding Brad Ewing, Dr. Ransom was of the opinion that the history obtained was substantially deficient. That record reflected "severe stomach pains". Dr. Ransom further commented
A. The history that's provided here says that "Brother stated patient had been out in the hot sun all day. Patient is perspiring profusely," which really isn't history. He had abdominal pains so the history is, from the brother, that he'd been out in the sun and patient stated that he had abdominal pains.
A second area of inquiry preliminary to the diagnosis is physical examination of the patient. By reference to the medical records of what was done in the case of Brad Ewing, Dr. Ransom was of the opinion that
the physical examination certainly deviates substantially from the routine examination which basically any patient ought to have but certainly a patient with acute abdominal pain.
Again, this is an area of medical inquiry which falls within the general scope of the knowledge, skill and general competence of the physician. Put otherwise, it is a matter with respect to which physicians are expected to be competent without regard to the availability of facilities or equipment.
Our third area of inquiry is diagnostic testing. Dr. Ransom was of the opinion that at least five diagnostic tests should have been performed (even with the inadequate history obtained). These included a complete blood count (CBC), a urinalysis, an amylase test, a stool check for occult blood, and x-rays of the flat and upright abdomen. The record reflects that the first  the complete blood count  was done, that the second, a urinalysis, was ordered but apparently not performed. None of *368 the other three diagnostic tests were ordered, let alone run.
Here we emphasize that portion of Hall v. Hilbun which holds that a physician may not be faulted for failure to perform tests or procedures with respect to which the equipment and facilities are not reasonably available. Certainly, in this context, before Dr. Brantley and the Hinds General Hospital could be faulted, it must be shown that the facilities for the performing of the tests in question were reasonably available. This evidence does not appear in the record, although we are so confident that these facilities were available that we are almost inclined to take judicial notice of same. To be on the safe side, however, on remand this predicate should be laid.
Assuming the availability of the technical resources with which to perform these tests, Dr. Ransom is otherwise qualified as an expert to offer an opinion as to whether these diagnostic tests and procedures should have been utilized in the case of Brad Ewing.
The final area in which Dr. Ransom found fault with Dr. Brantley and the Hinds General Hospital derives from the first three areas and has to do with the diagnosis made. Indeed, the essence of this malpractice action is the Plaintiff's charge of negligent failure to diagnose. By reference to his training and experience and several authoritative texts in the field, Dr. Ransom offered his opinion that "perforation is one of the easiest diagnoses to make" and that when confronted with this type problem "diagnostic accuracy and skill should be a hundred percent". Put another way, Dr. Ransom testified that he had never encountered a patient who had died of a perforated duodenal ulcer. We consider this in the context of the testimony by Dr. Rodrigo Galvez, a pathologist, who testified that he had performed over 2,000 autopsies and had never performed an autopsy where someone had died of a perforated ulcer.
Assuming a proper diagnosis, Dr. Ransom was then asked the question whether "a perforated ulcer [is] easily treatable". His answer was
"Certainly. The surgery is well defined, well developed, and generally accessible in areas where you have qualified general surgeons."
We doubt anyone would question that Jackson and Hinds County are areas where there are a substantial number of qualified general surgeons.
When the facts of this particular case are scrutinized under the legal principles enunciated in Hall v. Hilbun, we hold as follows: To the extent that the testimony of Dr. Ransom may have been excluded because he lived in and had his professional practice in Birmingham, Alabama, the trial court erred. To the extent that the testimony of Dr. Ransom was excluded in its entirety because he was supposedly not familiar with the standard of care in Jackson and Hinds County, Mississippi, in general, or in the Hinds General Hospital in particular, the trial court erred. Hall v. Hilbun, 466 So.2d at 874.
Without the testimony of Dr. Ransom, Plaintiff Hardy has no case. With that testimony, there is a substantial probability that Plaintiff Hardy would survive a motion for a directed verdict. Our core holding today is that the trial judge erred when he directed a verdict for Defendants without taking into account the expert testimony of Plaintiff's witness, Dr. Frederic G. Ransom. That error was prejudicial because the testimony of Dr. Ransom does suggest a basis upon which reasonable minds might determine that Dr. Brantley and Hinds General Hospital breached the duty of care each owed to Brad Ewing. The judgment below in favor of Dr. Brantley and against Plaintiff Hardy is reversed, and this case is remanded for a new trial.[4]
*369 At the new trial, if Plaintiff Hardy wishes to call Dr. Ransom, he may be permitted to testify and be cross-examined consistent with the legal principles stated in Hall v. Hilbun.

IV.
With respect to the Defendant Hinds General we must go further. It will be recalled that at the conclusion of Plaintiff's proof the trial judge directed a verdict in favor of Hinds General as well as Dr. Brantley. We are told that this ruling was correct, among other reasons, because Dr. Brantley was an independent contractor and the hospital can have no liability for his defaults, if any.
We regard the question whether a hospital operating an emergency may be held liable vicariously or under the theory of respondeat superior for the conduct of emergency room physicians retained by the hospital as one of first impression in this state. Porter v. Pandey, 423 So.2d 126 (Miss. 1982), addresses a related topic but fails to consider the respondeat superior theory.
In its brief Hinds General makes much of its contractual arrangement with Dr. Brantley and the members of the Hinds Emergency Group, the details of which are recited in Section II(B) above. The hospital and the emergency room physicians (or any other health care providers for that matter), of course, are free to make as between themselves whatever agreement they may desire. To be specific, the hospital and the emergency physicians are certainly free to agree, if they wish, that the physician shall have full control of patient care, even to the point of agreeing to indemnify the hospital for liability vicariously incurred. Our concern, however, regards the rights and duties of the hospital vis-a-vis the patient, not the emergency room physician.
In this context, we sense a core of logic in cases from other states that appear to hold the hospital vicariously liable for the negligence or malpractice of staff physicians, no matter what the contract between them may say.[5] The seminal case is Brown v. Lasociet Francise de Bienfiasance Mutuelle, 138 Cal. 475, 71 P. 156 (1903), which based its findings of agency upon two facts: (1) the patient seeks treatment from the hospital as opposed to a particular doctor, and (2) the hospital paid the doctor a salary. In Kober v. Stewart, 148 Mont. 117, 417 P.2d 476 (1966), the Montana court followed this lead, and in spite of a contractual arrangement very similar to the one here, found a hospital to be vicariously liable for the acts of X-Ray technicians provided by an X-Ray clinic because (1) no one requested the services of the particular radiologist, (2) the three radiologists rotated their periods of service at the hospital, (3) a hospital employee asked the radiologist to read the X-Rays, (4) the radiologist was on call, (5) it was the hospital's standard procedure to call its own radiologist, (6) the hospital owned and operated the equipment and sent one bill including the doctor's fee, and (7) the clinic received a percentage of gross receipts.
In the context of a claim that a hospital was vicariously liable for the negligence of a staff radiologist, Beeck v. Tucson General Hospital, 18 Ariz. App. 165, 500 P.2d 1153 (1972), provides an extensive discussion of the doctrine of respondeat superior. The contract between the radiologist and the hospital was substantially similar to that here between HEG and the Hinds General Hospital. Also analogous to the case at bar is the fact that the patient in Beeck sought the services of the hospital, not a particular radiologist. The Beeck court held the hospital liable for the negligence of the radiologist under the theory of respondeat superior.
A similar result has been reached in cases in which hospitals have been sued for neglect by emergency room physicians.
In Adamski v. Tacoma General Hospital, 20 Wash. App. 98, 579 P.2d 970 (1978), the Washington court and found that

*370 "The experience of the courts has been that application of hornbook rules of agency to the hospital physician relationship leads to unrealistic and unsatisfactory results, at least from the standpoint of the injured party. Consequently we have seen a substantial body of special law emerging in this area; the result has been an expansion of hospital liability for negligent medical acts committed on the premises."
20 Wash. App. at 105, 579 P.2d at 974.
In Adamski, the court found a hospital liable for the acts of its emergency room physician even though the latter was part of a group whose contract with the hospital stated that it was an independent contractual relationship. It should be noted, however, that in that case, the doctors were paid a salary by the hospital.
Stronger than Adamski is Hannola v. City of Lakewood, 68 Ohio App.2d 61, 426 N.E.2d 1187 (1980). In Hannola, the court held an institution purporting to be a full-service hospital estopped to deny that the physicians and other personnel on duty in its emergency room were employees of the hospital, regardless of the nature of the employment contract, assuming damages and proximate cause were present. To like effect are Arthur v. St. Peter's Hospital, 169 N.J. Super. 575, 405 A.2d 443 (1979) and Capan v. Divine Providence Hospital, 287 Pa.Super. 364, 430 A.2d 647 (1980). The basic rationale of these cases is that, unless there is some reason for a patient to believe that the treating physician in a hospital is an independent contractor, it is natural for him to assume that he can rely upon the reputation of the hospital as opposed to any doctor, which is the reason he goes there in the first place. These cases recognize his prerogative to make that assumption.
The most recent case we have found from a sister state is the most persuasive yet. Smith v. St. Francis Hospital, Inc., 676 P.2d 279 (Okla. Ct. App. 1983), was a suit against a hospital predicated upon the emergency room physician's failure to diagnose correctly plaintiff patient's appendicitis, as a result of which his appendix ruptured. The facts reflected that, as here, the hospital had a contract with a group of emergency room physicians organized as Emergency Care, Inc. (ECI). The contract provided that ECI would staff the hospital's emergency room and provide emergency health care services. The physician responsible for the misdiagnosis was technically employed by ECI. In the face of the hospital's claim that the physician was an independent contractor, the Smith court held
the hospital must be held accountable for the negligence, if any, of its authorized emergency room physician regardless of whether or not he is an independent contractor by secret limitations contained in private contract between the hospital and doctor or by virtue of some other business relationship unknown to the patient and contrary to the hospital's conduct and representations.
676 P.2d at 283.
We see no reason why cases of this sort should be outside the mainstream of the general tort law. We note that Restatement (Second) of Torts § 429 (1966) provides:
One [Hinds General] who employs an independent contractor [Dr. Brantley and his group] to perform services for another [Brad Ewing] which are accepted in the reasonable belief that the services are being rendered by the employer or by his servants, is subject to liability for physical harm caused by the negligence of the contractor in supplying such services, to the same extent as though the employer were supplying them himself or by his servants.
This is consistent with the agency principle of apparent authority long-recognized in this state. See Gulf Guaranty Life Insurance Co. v. Middleton, 361 So.2d 1377, 1383 (Miss. 1978); Clow Corporation v. J.D. Mullican, Inc., 356 So.2d 579, 583 (Miss. 1978); Glenn's All American Sportswear, Inc. v. Thompson, 257 So.2d 866, 869 (Miss. 1972); McPherson v. McLendon, 221 So.2d 75, 78 (Miss. 1969). The *371 reason why these general principles apply to suits against hospitals are of relatively recent origin. No longer are hospitals merely physical facilities where physicians practice their professions. Hospitals hold themselves out to the public as offering and rendering quality health care services. We notice a marked increase in advertisement and other forms of solicitations of patients as hospitals compete for the health-care dollar.
It goes without saying that hospitals such as Hinds General are corporate entities capable of acting only through human beings whose services the hospital engages. In arrangements such as that existing between Hinds General and HEG, the hospital places a great portion of its eggs in the baskets of the emergency room physicians. If they do their job well, the hospital succeeds in its chosen mission, profiting financially and otherwise from the quality of emergency care so delivered. On such facts, anomaly would attend the hospital's escape from liability where the quality of care so delivered was below minimally acceptable standards. All of this is surely so whether the high or low quality of emergency care is delivered by physician, nurse, paramedic or any other person engaged by the hospital.
Reason dictates the validity of the above premises without regard to the details of any undisclosed agreement between the hospital and the person acting in its behalf. We say this in the context of the fact that patients often seek emergency care and treatment from the hospital, not from any particular physician. The patient entering the hospital emergency room seldom knows the name of the physician who will treat him. Although there may be important factual variations from case to case, a patient's non-selection of his physician is often the rule in the case of anesthesiologists, radiologists and particularly emergency room physicians. We are presented such a situation here. Larry Ewing testified he and Brad sought emergency care of Hinds General, that they had never heard of Dr. Brantley, but were content to accept his care as in their view he had been furnished by the hospital. Under such circumstances, it seems only reasonable that the hospital should be estopped to deny responsibility for the neglect of its emergency room physicians. Smith v. St. Francis Hospital, Inc., 676 P.2d 279, 282 (Okla. Ct. App. 1983).
Having in mind the considerations and premises set forth in the above authorities, we have concluded that the better rule to be followed in this state henceforth is this: Where a hospital holds itself out to the public as providing a given service, in this instance, emergency services, and where the hospital enters into a contractual arrangement with one or more physicians to direct and provide the service, and where the patient engages the services of the hospital without regard to the identity of a particular physician and where as a matter of fact the patient is relying upon the hospital to deliver the desired health care and treatment, the doctrine of respondeat superior applies and the hospital is vicariously liable for damages proximately resulting from the neglect, if any, of such physicians. By way of contrast and distinction, where a patient engages the services of a particular physician who then admits the patient to a hospital where the physician is on staff, the hospital is not vicariously liable for the neglect or defaults of the physician.[6]
*372 A salutary feature of the rule we adopt today is illustrated by some of the evidence at trial. Plaintiff's expert witness, Dr. Ransom, has criticized several features of the health care services afforded Brad Ewing; specifically, that an inadequate patient medical history was obtained and a urine specimen was not obtained and analyzed. Although the testimony is less than comprehensive on these subjects, it is clear that there could well develop a controversy between Dr. Brantley and the hospital as to who was responsible for these defaults if, indeed, there were defaults. In such matters it is certainly important for the trial to pinpoint responsibility. Fairness dictates that the plaintiff patient's burden should be to show only that an inadequate history was obtained and that the urinalysis was a medically appropriate diagnostic test that was not performed. In the context of this case, the rule we adopt today will leave it to Dr. Brantley and the hospital to determine ultimate responsibility, factually and legally, and, as we have indicated above, they may by contract allocate that responsibility among themselves as they see fit (including agreements as to who will have the obligation to obtain insurance against what risks).
We have reached these conclusions after careful consideration of the two principal arguments which have been advanced by Hinds General  and with not inconsiderable ability. First, Hinds General argues that it has no right or authority to control the activities of the emergency room physicians and cites provisions of its contract in support. It would be unjust according to the argument to hold the defendant hospital liable for damages caused by one whom it could not control. The problem with the argument is that Hinds General appears on these facts to hold itself out as providing full emergency care and treatment. Hinds General places the physicians in a position where they serve and treat members of the general public, persons who undoubtedly have no knowledge of the hospital's lack of authority to control. If persons in this context seek and accept Hinds General's services, we regard that it would be unjust to allow Hinds General to contract away liability for the negligence of its physicians, particularly where such an agreement is beyond the knowledge or perception of the patient.
We note that the contract between Hinds General Hospital and HEG provides, in paragraph 10, that Hinds General's
sole interest and responsibility ... is to insure that the Emergency Department and services covered by this agreement shall be performed and rendered in a competent, efficient and satisfactory manner.
In the context of this contractual acceptance of responsibility for the competence of the emergency services it renders, Hinds General's lack of control argument appears disingenuous.
Second, Hinds General argues that a decision to hold it vicariously liable would necessarily have to be founded on the premise that the hospital is engaged in the practice of medicine when in fact the hospital is not, and in law cannot become, licensed to practice medicine. Hinds General cites Porter v. Pandey, the bottom line of which is
If we were to impose that duty on hospitals, hospitals would then be required to *373 engage in the practice of medicine contrary to our statute.
423 So.2d at 127.
The Porter reasoning is bootstraps logic which appears flawed upon examination.
In New Biloxi Hospital v. Frazier, 245 Miss. 185, 146 So.2d 882 (1962), this court found a hospital liable for the negligent failure of its nurse to stop a man from bleeding to death. In the course of the opinion, this Court said that a hospital rendering emergency treatment has a duty to exercise due care to see that all which is immediately and reasonably necessary to the preservation of life and limb is done before the patient is discharged. 245 Miss. at 198, 146 So.2d at 887.
If a hospital may be held liable for the actions of a nurse, even though hospitals cannot be licensed as an R.N., on what principle based in reason may it not be held liable for the actions of a staff physician, even though the hospital is not licensed to practice medicine? No rational basis for a distinction is readily apparent, and none has been suggested.
There is yet another analogous context which suggests the error of the Porter reasoning. More and more physicians in this state engage in the practice of medicine through professional corporations organized and existing in accordance with Miss. Code Ann. §§ 79-9-1 et seq. (1972). We particularly note Section 79-9-11 which provides, first, that, notwithstanding the professional corporation form of organization, the person furnishing the professional services remains individually liable and thereafter provides
The corporation shall be liable to the full extent of its property for any negligent or wrongful acts or misconduct committed by any of its officers, shareholders, agents or employees while they are engaged on behalf of the corporation in the rendering of professional services.
A professional corporation may not be licensed to practice medicine in Mississippi any more than may a hospital; yet, no one suggests that the imposition of liability on the professional corporation would have the effect of requiring it "to engage in the practice of medicine contrary to our statute." 423 So.2d at 127. Seen in this light, we have no alternative but to declare forthrightly that the rationale of Porter v. Pandey is overruled and will no longer be recognized in our law.[7]
Nothing here should be taken as holding that Dr. Brantley was negligent or that Hinds General Hospital was vicariously liable for such negligence, if any. In the procedural posture of the case, such conclusions would be forbidden, even if we were so disposed. What  and all  we do today is test Plaintiff's evidence against Hinds General under the substantive rules articulated above.
In this context, we note particularly the testimony of Larry Ewing on direct examination.
Q. When you went to Hinds General Hospital, did you request a specific doctor?
A. No, sir.
Q. How did you come about securing the services of Dr. Terry Brantley?
A. Hinds General Hospital supplied him.
Q. Did you know Dr. Terry Brantley before you arrived there at the hospital?
A. No, sir.
Q. Did your brother know Dr. Terry Brantley?
A. No, sir.
Q. Has he ever treated either you or any member of your family before that time?
A. No, sir.
For reasons familiar to all, we view this and all other evidence in the record in the light most favorable to Plaintiff giving Plaintiff the benefit of all reasonable favorable inferences that may be drawn therefrom. *374 Cf. Stubblefield v. Jesco, Inc., 464 So.2d 47, 54-56 (Miss. 1984); City of Jackson v. Locklar, 431 So.2d 475, 478 (Miss. 1983); Paymaster Oil Mill Co. v. Mitchell, 319 So.2d 652, 657 (Miss. 1975); see also Pharr v. Anderson, 436 So.2d 1357, 1361 (Miss. 1983); Dazet v. Bass, 254 So.2d 183, 187 (Miss. 1971). So viewed we cannot say that Plaintiff's evidence against Hinds General was so lacking that no reasonable juror  had the evidence in the record been all that was before him or her  could have found for Plaintiff.[8] For this reason we reverse and remand for plenary trial on the merits of all issues, consistent with the principles of law articulated above.
Because we reverse on the grounds discussed above, we find it unnecessary to consider any of the other assignments of error tendered by Plaintiff.
REVERSED AND REMANDED FOR A NEW TRIAL
PATTERSON, C.J., ROY NOBLE LEE, P.J., and HAWKINS, DAN M. LEE, PRATHER and SULLIVAN, JJ., concur.
WALKER, P.J., dissents.
ANDERSON, J., not participating.
WALKER, Presiding Justice, dissenting:
I respectfully dissent. This case was fairly tried in the lower court with a judgment in favor of the defendant, Dr. Brantley and that verdict should be affirmed. The plaintiff's expert witness, Dr. Frederic G. Ransom, was not qualified to testify under our holding in King v. Murphy, 424 So.2d 547 (Miss. 1982) which was in effect at the time this case was tried and was properly excluded by the trial court. In my opinion the procedure laid down in King with respect to qualifying an expert witness in medical malpractice cases was sound, and this Court should not have modified and expanded the rule as was done in Hall v. Hilburn, 466 So.2d 856 (Miss. 1985).
Dr. Brantley will now be put to the expense of another trial under new rules which, in my opinion, is unfair. Cases such as this cause the litigants and the general public to lose confidence in the judicial process.
I also join in the dissent of Justice Dan Lee as to that part of the majority opinion which establishes a new rule of law heretofore unrecognized in this State that a hospital shall henceforth be liable for the negligence of its contract physicians who work in the hospital. In adopting this new rule of law, the Court overruled the recent case of Porter v. Pandey, 423 So.2d 126 (Miss. 1982).
DAN M. LEE, Justice, concurring in part and dissenting in part:
I concur in Parts I-III of the majority opinion. I must dissent; however, to Part IV of the majority opinion. Porter v. Pandey, 423 So.2d 126 (Miss. 1982), was decided only three years ago. I am unconvinced that that decision was wrong and see no reason to overrule it. The majority's decision to impose liability on a hospital for the negligent actions of a physician independent contractor is certain to have a negative impact in terms of health care costs and availability. Because I would leave the business of running hospitals to physicians and hospital administrators I would adhere to the rule that the negligence of an independent contracting physician is not imputable *375 to the hospital. I would affirm the trial court's decision to grant a directed verdict as to Hinds General.
CONCURRING IN PART AND DISSENTING IN PART.
WALKER, P.J., joins this dissent as to Part IV.
NOTES
[1] The procedural posture of this case  this appeal being from the trial judge's granting of Defendants' motion for a directed verdict made at the close of Plaintiff's case  impacts greatly upon the way the above statement of the facts should be read and understood. First, we are required to view (and, accordingly, to state) the facts in the light most favorable to Plaintiff. Edwards v. Cleveland Food, Inc., 437 So.2d 56, 58 (Miss. 1983). Second, we do not have before us the evidence the Defendants would have offered had they been required by the trial judge to go forward and present their cases. Each of these factors necessarily contributes to the appearance of the above statement of the facts as pro-plaintiff.
[2] We are not insensitive to the likelihood that someone acting on Brad's behalf actually told whoever was recording the history that Brad had been working in the fields in the hot sun. Similarly, we would like to think we appropriately appreciate the heavy reliance a diagnostician should and does place upon the history provided by the patient. In our present procedural posture, however, we are required to resolve all disputed factual questions in favor of Plaintiff. See supra note 1.
[3] What we say in the preceding three paragraphs above is consistent with Rule 702 of the proposed Mississippi Rules of Evidence, petitions for adoption of which are presently pending before the Court. See Hall v. Hilbun, 466 So.2d at 874 n. 8.
[4] We emphasize that today's opinion does not adjudge Dr. Brantley guilty of malpractice; only that Plaintiff's proof was sufficient to present a jury question in that regard. Dr. Brantley, of course, has not yet presented his case. See footnote 1 above.
[5] There is no evidence in this record that either Brad Ewing or any members of his family had any knowledge of the contents of the agreement Hinds General and HEG.
[6] We are aware of the emerging trend in other states to adopt a theory of corporate negligence in the adjudication of patient claims against hospitals. See, e.g., Tucson Medical Center, Inc. v. Miseuch, 113 Ariz. 34, 36, 545 P.2d 958, 960 (1976); Elam v. College Park Hospital, 132 Cal. App.3d 332, 337-48, 183 Cal. Rptr. 156, 158-165 (1982); Buckley v. Lovallo, 2 Conn. App. 579, 481 A.2d 1286, 1289 (1984); Mitchell County Hospital Authority v. Joiner, 229 Ga. 140, 141, 189 S.E.2d 412, 414 (1972); Darling v. Charleston Community Memorial Hospital, 33 Ill.2d 326, 329-39, 211 N.E.2d 253, 257-61 (1965); Ferguson v. Gonyaw, 64 Mich. App. 685, 696-68, 236 N.W.2d 543, 550 (1975); Gridley v. Johnson, 476 S.W.2d 475, 484 (Mo. 1972); Moore v. Board of Trustees of Carson-Tahoe Hospital, 88 Nev. 207, 211, 495 P.2d 605, 608 (1972); Corleto v. Shore Memorial Hospital, 138 N.J. Super. 302, 307-09, 350 A.2d 534, 537-38 (1975); Felice v. St. Agnes Hospital, 65 A.D.2d 388, 396, 411 N.Y.S.2d 901, 907 (1978); Bost v. Riley, 44 N.C. App. 638, 262 S.E.2d 391, 396 (1980); Pedroza v. Bryant, 101 Wash.2d 226, 231-35, 677 P.2d 166, 168-70 (1984); Johnson v. Misericordia Community Hospital, 99 Wis.2d 708, 723-34, 301 N.W.2d 156, 164-68 (1981). Corporate negligence imposes upon a hospital a direct and independent responsibility to its patients of insuring the competency of its medical staff and the quality of medical care provided through the prudent selection, review and continuing evaluation of the physicians granted staff privileges. This rule would seem to have more application with respect to charges of health care malpractice made against the hospital where the physician charged is engaged in private practice physically and otherwise wholly separate and apart from the hospital, and where, with respect to the hospital, the physician is merely on staff. Today, however, we have no occasion to ascertain the validity of the corporate negligence doctrine in Mississippi or its contours. We merely note its acceptance in other states.
[7] The result reached in Porter v. Pandey, given the facts of that case, is arguably sound although on a rationale different from that offered in the opinion. Today's adjudication does not require that the holding of Porter be overruled, only its rationale.
[8] Here, because of the procedural posture of the case, we have stated the facts most favorably to the Plaintiff on the respondeat superior theory. Nothing said here should be taken as holding that on remand Plaintiff is entitled to a peremptory instruction against the hospital on the respondeat superior issue. Rather, here, as elsewhere, we merely hold that Plaintiff has presented enough evidence to survive a motion for directed verdict on her claim against the hospital. On remand this issue should be tried anew and treated as any other issue involving substantial factual components when presented to a circuit court sitting with a jury. City of Jackson v. Locklar, 431 So.2d 475, 478-479 (Miss. 1983); Paymaster Oil Mill Co. v. Mitchell, 319 So.2d 652, 657 (Miss. 1975). Suffice it to say that, if Plaintiff should fail to establish all of the factual elements required under respondeat superior, Hinds General could be held conceivably liable only if Plaintiff shows corporate negligence within the meaning and contemplation of the cases cited in footnote 6 above.