Jewel Rogers GAMBLE, etc., Plaintiff,

v.

UNITED STATES of America, Defendant and Third-Party Plaintiff,

v.

UNIVERSITY ANESTHESIOLOGISTS, INC., Third-Party Defendant.

C85–1199.

United States District Court, N.D. Ohio, E.D.

Nov. 25, 1986.

John G. Lancione, Paige A. Martin, Spangenberg, Shibley, Traci & Lancione, Cleveland, Ohio, for plaintiff.

Carla D. Moore, Marcia W. Johnson, Alan J. Ross, Asst. U.S. Attys., Cleveland, Ohio, for defendant and third-party plaintiff.

Leslie J. Spisak, Reminger & Reminger, Cleveland, Ohio, for third-party defendant.

## ORDER OVERRULING DEFENDANT'S MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

KRENZLER, District Judge.

This is a medical malpractice/wrongful death action brought by plaintiff Jewel Rogers Gamble, the Administratrix of the Estate of Ernest Gamble. In her complaint, plaintiff alleges negligence on the part of the anesthesiologist, the surgeon and the Veterans Administration Medical Center (the "VA") staff during an operation on Ernest Gamble, which resulted in his death. Jurisdiction of this Court is predicated upon the Federal Tort Claims Act (the "FTCA"), 28 U.S.C. §§ 2671, *et seq.* Defendant filed an answer and third-party complaint, naming University Anesthesiologists, Inc. as a third-party defendant in this action. The government contends in its third-party complaint that to the extent negligence is found to be the cause of the decedent's death, such negligence was exclusively the negligence of Unversity Anesthesiologists, Inc. and not the United States.

Pending before this Court is the government's motion to dismiss or, in the alternative, for summary judgment. The government presents two legal arguments to this Court in its motion: (1) the Court lacks subject matter jurisdiction to entertain this matter against the government under the independent contractor exception to the FTCA; and (2) the doctrine of loaned servant bars plaintiff from recovery for any

negligent acts of the nurse anesthetist. Both the government and the plaintiff have filed briefs regarding the government's motion. For the reasons provided below, the Court overrules the government's motion to dismiss or, in the alternative, for summary judgment.

## I.

The stipulations submitted by the parties in the attorneys' pretrial statement reveal the following undisputed facts. In April of 1983, Ernest Gamble, Jr., a 54–year-old black male, entered the VA hospital at Wade Park in Cleveland, Ohio. He was admitted for a colon resection.

Mr. Gamble was operated on during the morning of April 28, 1983. Dr. John Fraser, an anesthesiologist, and Rosetta Geraci, an anesthesia assistant student, were assigned the anesthetic treatment of Mr. Gamble. While Mr. Gamble lay on the operating table, anesthesia was induced by Dr. Fraser. The patient was intubated by Dr. Norma Lemon, a VA medical resident, under the direct supervision of Dr. Fraser. Dr. Fraser checked the placement of the endotracheal tube and secured the tube with cloth ribbon.

Subsequently, Mr. Gamble was moved down the table three or four inches and his legs were placed in stirrups. Immediately following this repositioning, a sigmoidoscopy procedure was begun. Dr. Fraser left the operating room. Mrs. Mary Lo, a nurse anesthetist employed by the VA, replaced him temporarily. Mrs. Lo was not assigned to a particular operating room on that day, but was assigned to "float" from room to room to relieve the anesthesia staff for their breaks.

Upon entering the operating room, Mrs. Lo sensed something was wrong and checked the endotracheal tube. At about the same time, Dr. Robert Gerding, after having inserted the sigmoidoscope, commented on the dusky bluish color of the rectum mucosa. At this point, Mr. Gamble developed bradycardia—slowing of the heart rate. Mrs. Lo called for Dr. Fraser's return and gave the patient atropine, a drug to increase his heart rate.

Dr. Fraser returned to the operating room within moments of the call. He immediately reintubated Mr. Gamble and resuscitated him. Mr. Gamble later was transferred to the Surgical Intensive Care Unit, where he underwent neurological evaluation, but remained comatose. He died on May 2, 1983. Mr. Gamble was believed to have suffered cardiorespiratory arrest incident to endotracheal intubation.

## II.

Under the FTCA, the United States is liable for "personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b). "Employees of the government" are defined to include "officers or employees of any federal agency ..., and persons acting on behalf of a federal agency in an official capacity, temporarily or permanently in the service of the United States, whether with or without compensation." 28 U.S.C. § 2671. The term "federal agency" includes "the executive departments and independent establishments of the United States ... but does not include any contractor within the United States." *Id.*

In enacting the FTCA, Congress intended to waive the sovereign immunity of the federal government and provide compensation to victims of "ordinary common law torts." *Dalehite v. United States,* 346 U.S. 15, 28, 73 S.Ct. 956, 964, 97 L.Ed. 1427 (1953); *Feres v. United States,* 340 U.S. 135, 142, 71 S.Ct. 153, 157, 95 L.Ed. 152 (1950). In effect, Congress adopted the common law principle of *respondeat superior*—the government is liable in tort for the negligent conduct of its employees or agents, but is not liable for the actions of an independent contractor.

*Gowdy v. United States,* 412 F.2d 525 (6th Cir.), *cert. denied,* 396 U.S. 960, 90 S.Ct. 437, 24 L.Ed.2d 425 (1969).

In its motion to dismiss or for summary judgment, the government contends that it is not liable for the acts of Dr. Fraser: the government alleges that Dr. Fraser acted as an independent contractor and, therefore, was not an officer or agent of a "federal agency."

In the instant case, the VA hospital entered into a contract with University Anesthesiologists, Inc. on March 31, 1981. Under the contract, University Anesthesiologists, Inc. provided anesthesiology services to the hospital. Although the written contract had an express expiration date of March 31, 1982, the parties continued to perform pursuant to its terms. A renewal contract finally was entered into on August 1, 1985. In the meantime, anesthesia services continued in accordance with the previous contract.

Dr. Fraser was the physician who serviced the VA pursuant to the contract. He was a board-certified physician in anesthesiology, and had worked at the VA since 1978. At the VA, Dr. Fraser held himself out to be the Chief of the Anesthesia Section, with the VA's consent. The Anesthesia Section is a subdivision of surgical service at the VA; Dr. Fraser maintained his office in the surgery department.

■ The issue of who is a federal employee and who is an independent contractor for purposes of the FTCA is governed by federal law and not state law. *Fisher v. United States,* 356 F.2d 706, 708 (6th Cir. 1966), *cert. denied,* 385 U.S. 819, 87 S.Ct. 41, 17 L.Ed.2d 57 (1966). In most instances, the crucial test to determine whether a person is an independent contractor is the power of the federal government "to control the detailed physical performance of the contractor." *Orleans v. United States,* 425 U.S. 807, 814, 96 S.Ct. 1971, 1975, 48 L.Ed.2d 390 (1976) (citing *Logue v. United States,* 412 U.S. 522, 528, 93 S.Ct. 2215, 2219, 37 L.Ed.2d 121 (1973)). In the instant case, however, the essential question is whether the United States may insulate itself by contractual arrangement from liability for acts of medical malpractice committed by an anesthesiologist in a VA hospital.

■ This Court concludes that the United States should be equitably estopped from asserting that Dr. Fraser was not a government employee. The doctrine of equitable estoppel, as invoked in this case, rests upon the theory that a person has been led to rely upon the appearance of agency to his detriment. The Supreme Court has indicated that a showing of "affirmative misconduct" is necessary to estop the government. *See INS v. Miranda,* 459 U.S. 14, 103 S.Ct. 281, 74 L.Ed.2d 12 (1982) (*per curiam*).

In the instant case, the government should be estopped to deny Dr. Fraser was an employee of the VA. The VA holds itself out as a full-service hospital. By holding itself out to patients that it will provide full services, including anesthesia services, the VA induces reliance upon the relationship of these services with the medical center. In essence, an agency by estoppel is established by creating an effect—the appearance that the hospital agents, not independent contractors, will provide medical care to those who enter the hospital. The patient relies upon this as a fact and believes he is entering a full-service hospital.

Patients who require anesthesia normally do not choose their physician, nor are they told that they are being cared for by an independent contractor under the supervision and control of University Anesthesiologists, Inc. and not the VA. In this case, Dr. Fraser did business as the Chief of the Anesthesia Section and maintained his office in the surgery department of the VA, with the consent of the VA. This consent, and the VA's holding itself out as a full-service hospital, constitute the affirmative actions necessary to estop the government from denying Dr. Fraser is a government employee.

■ Furthermore, sound public policy demands that the United States not be per-

mitted to contractually insulate itself from liability for acts of medical malpractice committed in government hospitals. *See Hannola v. Lakewood,* 68 Ohio App.2d 61, 426 N.E.2d 1187 (Ohio Ct.App.1980) (finding agency by estoppel with respect to emergency room service being provided at a full-service hospital). The *Hannola* court stated in relevant part:

> [S]ound public policy demands that the full-service hospital not be permitted to contractually insulate itself from liability for acts of medical malpractice committed in its emergency room. First, the emergency room is an integrally related part of the full-service hospital. The hospital may not pretend that this essential element of its public service treatment facilities is a separate entity. Moreover, the nature of the situation when people turn to the hospital and its emergency room facilities for treatment is one fraught with crisis.... Given the relationship of the emergency room to the full-service hospital and the crisis circumstances under which people seek emergency treatment, public policy requires that the hospital not be able to artificially screen itself from liability for malpractice in the emergency room.

*Id.* at 65–66, 426 N.E.2d at 1190.

██ The statements of the *Hannola* court with respect to the emergency room are even more compelling with respect to the services of an anesthesiologist in the operating room. Anesthesia services are an important part of a full-service hospital. The anesthesiologist works closely with others involved in the surgery, regardless of whether the anesthesiologist is an independent contractor for some purposes. Further, the anesthesiologist is not always present in the operating room during surgery, but often leaves the patient in the care of a nurse anesthetist employed by the hospital. Indeed, in the instant case, Dr. Fraser left the operating room during the operation, and left the decedent in the care of Mrs. Lo, a nurse anesthetist employed by the VA. The Court, therefore, finds that regardless of any contractual arrangements with so-called independent contrac-

tors, the United States will be liable for acts of malpractice committed by anesthesiologists in government hospitals, assuming proximate cause and damage are present.

The above analysis comports with the public's expectations of modern hospitals. As stated in the Note, Independent Duty of a Hospital to Prevent Physicians' Malpractice, 15 Ariz.L.Rev. 953, 967 (1973) (cited in *Hannola,* 68 Ohio App.2d at 66, 426 N.E.2d at 1190–91):

> The image of modern hospitals as centers of medical practice of the highest quality is understandably cultivated by the hospitals themselves. Nonprofit hospitals do not, of course, advertise as such. But they do maintain a high degree of "visibility" in the community through fund-raising campaigns, community relations programs, public service programs, press releases and the like, all presenting the hospital as a unified institution vital to community health, rather than as a mere physical shell in which private physicians practice their profession.

> \* \* \*

> The public, however, has been led to accept its image of the hospital as the correct one; it relies on this image in its willingness to make use of hospital facilities. Public outrage, and possibly even an effect on admissions at a typical hospital, would surely follow a public announcement by the hospital that it regards all staff doctors as completely independent professionals, conducts no supervision of their performance and takes no interest in their competence. The public assumes, correctly or not, that the hospital exerts some measure of control over the medical activities taking place there.

Because the Court concludes that the government is estopped from denying Dr. Fraser was a government employee, the Court further finds that the doctrine of loaned servant is not applicable in this case and does not bar plaintiff from recovery for any negligent acts of the nurse anes-

thetist. Accordingly, the defendant's motion to dismiss or, in the alternative, for summary judgment is overruled.

IT IS SO ORDERED.