Debra MacDONALD, Plaintiff,

v.

UNITED STATES of America,
Defendant.

Civ. A. 92–25–VAL (WDO).

United States District Court,
M.D. Georgia,
Valdosta Division.

Nov. 20, 1992.

J. Converse Bright, Valdosta, GA, Michael P. Curreri, Rodney K. Adams, Richmond, VA, for plaintiffs.

Lillian Harris Lockary, Macon, GA, for defendant.

## ORDER

OWENS, Chief Judge.

Before the court is defendant's motion to dismiss, which the court converted to a motion for summary judgment by order of July 29, 1992. After careful consideration of the arguments of counsel, the relevant case law, and the record as a whole, the court issues the following order.

## FACTS

Plaintiff is a dependant of a member of the United States Air Force and is entitled to medical treatment and benefits from the United States. Between January 28, 1982, and May 23, 1986, plaintiff received treatment for chest pain on numerous occasions at the medical facilities of Hill Air Force Base, Utah ("Hill AFB"). Hill AFB physicians made many different diagnoses of plaintiff's condition, but never made any determination of a cardiovascular problem. Moreover, they never performed any tests on plaintiff that are specially designed to diagnose cardiovascular problems. Plaintiff smokes regularly and is clinically obese. She was being treated for a hiatal hernia through her last visit to Hill AFB on May 23, 1986.

On June 27, 1988, plaintiff went to a medical clinic at Moody Air Force Base, Georgia, ("Moody AFB") for treatment of pain in her hip and side. She also complained of pain in her chest similar to "heartburn." A physician assistant initially diagnosed her with dyspepsia, but later determined that she had a hiatal hernia. She made several visits to the Moody AFB clinic for treatment of her condition. Although plaintiff was a heavy smoker and was clinically obese and these factors put her at risk of heart disease, none of the physicians at the clinic performed any tests or examinations specially designed to diagnose a cardiovascular problem.

On January 29, 1989, plaintiff was admitted to the emergency room with intense chest pain. The attending staff initially wanted to discharge plaintiff without treatment; however, after plaintiff insisted, an EKG was performed to test for heart disease. Dr. Kevin J. Beck, MD, determined that plaintiff suffered from heart disease after reviewing the EKG, and he ordered plaintiff to be transferred to a civilian hospital. The treatments that were needed by plaintiff were not available at Moody AFB. Dr. Beck did not provide any treatment for plaintiff while she was still in the Moody AFB emergency room.

After plaintiff was transferred to a civilian hospital, the civilian physicians determined that she had suffered a major heart attack. On February 7, 1989, laboratory tests revealed that plaintiff had hypothyroidism and high cholesterol levels. These conditions contribute to coronary artery disease. On February 22, 1989, tests showed that plaintiff had suffered severe and permanent cardiac damage. She continues to suffer from angina, shortness of breath, and severe limitations on her daily activity level.

Plaintiff filed an administrative claim alleging negligence against the United States on January 25, 1991. See Exhibit A. This claim was denied on September 12, 1991, and plaintiff subsequently filed this lawsuit. In her complaint, she makes extensive negligence claims against the United States.

The first set of claims is related to the treatment she received at Hill AFB. She alleges that Hill AFB physicians and physician assistants were negligent in failing to diagnose and treat her hypothyroidism, high cholesterol levels, and heart disease. She claims that all Hill AFB physicians and physician assistants who treated her were acting as employees of the United States during her treatment; therefore, the United States is liable for their alleged negligence.

The second set of claims is related to the treatment plaintiff received at Moody AFB. She alleges that Moody AFB physicians and physician assistants were negligent in failing to diagnose and treat her hypothyroidism, high cholesterol levels, and heart disease. She alleges that all Moody AFB physicians and physician assistants who treated her were acting as employees of the United States during her treatment; therefore, the United States is liable for their actions.

She also makes direct claims against the United States that include allegations of failure to supervise and failure to provide adequate medical equipment and services at the Moody AFB facility. These claims are only briefly addressed by the United States' motion.

## DISCUSSION

The United States attacks plaintiff's complaint on three basic grounds. First, the United States contends that all of plaintiff's claims related to her treatment at Hill AFB must be dismissed because she did not file an administrative claim concerning this treatment. Second, the United States contends that plaintiff's claims based upon the alleged negligence of Dr. Kevin Beck at Moody AFB must be dismissed because Dr. Beck was not an employee of the United States when his alleged negligence occurred. Finally, the United States contends that all of plaintiff's claims must fail because she cannot establish the essential element of proximate cause.

## I. The Hill AFB Claims

█ It is well established that the United States is immune from suit unless it has consented to be sued. *United States v. Sherwood,* 312 U.S. 584, 586, 61 S.Ct. 767, 769, 85 L.Ed. 1058 (1941). Under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671, *et seq.,* the United States waives its sovereign immunity in certain circumstances if a plaintiff meets certain requirements. One requirement is that a plaintiff must file an administrative claim with the appropriate federal agency before filing a suit in federal court. 28 U.S.C. § 2675(a). If a plaintiff fails to meet this requirement, the court has no subject matter jurisdiction over plaintiff's claim. *Molinar v. United States,* 515 F.2d 246, 249 (5th Cir.1975).

A person with a claim against the United States satisfies the administrative claim requirement if that person "(1) gives the agency written notice of his or her claim sufficient to enable the agency to investigate and (2) places a value on his or her claim." *Adams v. United States,* 615 F.2d 284, 289 (5th Cir.1980). In this case, plaintiff submitted her administrative claim to the Air Force Legal Services on January 25, 1991.

█ Plaintiff stated that January 29, 1989, was the "Date and Day of Accident" in her claim. In her description of the "Basis of Claim," she provides details of the treatment she received from two physicians at Moody AFB between June of 1988 and January of 1989. Then she describes all the events that occurred on January 29, 1989, when she had her heart attack. There is no mention whatsoever of any treatment she received at Hill AFB. *See* Exhibit A.

The government contends that plaintiff's administrative claim is insufficient to support any of her claims related to treatment she received at Hill AFB. It argues that the claim failed to provide the Air Force with any notice of negligence at Hill AFB that would enable it to investigate plaintiff's claim.

Plaintiff, on the other hand, contends that her administrative claim does encom-

pass the treatment she received at Hill AFB because of the following paragraph:

> Statements from doctors concerning the extent of injury, the treatment and the degree of disability are contained in my hospital records at Moody AFB Hospital. I authorize Moody AFB to examine my records in regard to this complaint.

She claims that because her medical records from Hill AFB were available at Moody AFB, defendant was put on notice of her negligence allegations concerning treatment at Hill AFB.

This argument has no merit. Plaintiff's administrative claim does not encompass the Hill AFB claims even when read as liberally as plaintiff suggests. Plaintiff's treatment at Moody AFB lasted from June 1988 to January 1989, and plaintiff's administrative claim encompasses those dates as well. However, plaintiff's treatment at Hill AFB occurred from January 1982 to May 1986.

Furthermore, there is no mention of a physician, treatment, or anything connected to Hill AFB. Thus, there is nothing in her administrative claim to indicate that plaintiff is basing a claim upon negligence allegedly occurring at Hill AFB when she was treated there from January 1982 to May 1986. The mere fact that plaintiff authorized the examination of medical records from Hill AFB does not provide the United States with notice that plaintiff is claiming negligent treatment at Hill AFB. *See Schunk v. United States*, 783 F.Supp. 72 (E.D.N.Y.1992) (plaintiff's administrative claim citing treatment provided at one hospital was insufficient to notify government of alleged negligence at another hospital).[1]

Therefore, this court has no subject matter jurisdiction over plaintiff's claims relating to the treatment she received at Hill AFB. Furthermore, because plaintiff failed to present an administrative claim encompassing these claims within two years of the alleged negligence, as required under 28 U.S.C. § 2401(b), these claims must be dismissed with prejudice. Accordingly, summary judgment in favor of defendant on all claims relating to the treatment plaintiff received at Hill AFB is GRANTED.

## II. The Claims Based Upon the Conduct of Dr. Kevin Beck

Some of plaintiff's claims are based upon the conduct of Dr. Kevin Beck, the Moody AFB emergency room physician who was on duty on January 29, 1989, when plaintiff suffered a heart attack. Plaintiff contends that Dr. Beck's untimely diagnosis of her heart condition and his failure to provide adequate treatment of her condition was negligence for which the United States is liable under the FTCA.

In order for the United States to be liable under the FTCA for Dr. Beck's alleged negligence, he must be an employee of the United States. 28 U.S.C. § 1346(b). In this case, Dr. Beck was employed by National Emergency Services, Inc. ("NES"), a corporation that contracted with the United

---

1. Plaintiff also contends that the Air Force was responsible for her omission of any references to her treatment at Hill AFB from her administrative claim. She specifically contends that an Air Force claims officer told her that her claim was sufficient to include alleged negligence at Hill AFB. In addition, she contends that the Air Force denied her access to her medical records at the time during which she was drafting her administrative claim.

The United States denies these allegations. However, even assuming that they are true, plaintiff, while represented by counsel, had opportunity not only to appeal the denial of her administrative claim but also to amend her administrative claim to conform with the complaint that she ultimately filed with this court. She should have made any allegations of misconduct by Air Force officials at this opportunity.

Plaintiff's administrative claim was denied on September 12, 1991, and she obtained counsel sometime prior to October 9, 1991. Under 28 U.S.C. § 2401(b), she had six months from the date on which her administrative claim was denied in which to file a complaint based upon this claim in federal court. She also had opportunity to appeal the denial of her administrative claim or to seek to amend it within this six-month period. 28 CFR § 14.9(b). Thus, plaintiff had sufficient opportunity to challenge any misconduct by Air Force officials that occurred when she filed her administrative claim during this six-month period. Whether Air Force officials improperly influenced her administrative claim is not an issue for this court.

States to supply physicians to the emergency room at Moody AFB. Thus, defendant contends that Dr. Beck was an independent contractor rather than a federal employee and, consequently, the United States is immune from plaintiff's claims involving Dr. Beck's alleged negligence. Plaintiff, on the other hand, contends that the circumstances of this case indicate that Dr. Beck was really an employee of the United States despite the NES contractual arrangement.

■ Under the FTCA, the United States is liable for certain torts of federal employees acting within the scope of their federal employment. 28 U.S.C. § 1346(b). However, the FTCA does not apply to torts committed by an independent contractor. 28 U.S.C. § 2671; *United States v. Orleans,* 425 U.S. 807, 96 S.Ct. 1971, 48 L.Ed.2d 390 (1976).

■ Whether one is an employee of the United States under the FTCA is a question of federal law. *Logue v. United States,* 412 U.S. 521, 93 S.Ct. 2215, 37 L.Ed.2d 121 (1973). The court makes this determination by applying the "control test", in which the court examines whether the United States has the authority "to control the detailed physical performance of the contractor" and whether the United States actually supervises the contractor's day-to-day operations. *Orleans,* 425 U.S. at 814, 815, 96 S.Ct. at 1976; *Logue,* 412 U.S. at 528–29, 93 S.Ct. at 2219–20, 37 L.Ed.2d 121.

■ The Southern District of Georgia applied the control test to facts nearly identical to those in this case in *Spitzer v. United States,* 1988 U.S.Dist. LEXIS 1635 (S.D.Ga.1988), and found that the physicians involved were independent contractors rather than employees of the United States. *Id.* at 11. In *Spitzer,* plaintiff sought damages for injuries he suffered during surgery at the Dwight David Eisenhower Army Medical Center ("Army Hospital") in August, Georgia. The physicians who performed plaintiff's surgery were employed by the Medical College of Georgia ("Medical College"), which had a contract with the United States to provide neurosurgery services to the Army Hospital. *Id.* at 3, 4.

In applying the control test, the court noted that the contract between the Medical College and the United States indicated that the Medical College and its employees were independent contractors to the United States. First, the contract stated that the services rendered by the Medical College were to be rendered in the capacity of independent contractor and that the Medical College was liable for its own torts. Relying on *Lurch v. United States,* 719 F.2d 333, 338 (10th Cir.1983), *cert. den.,* 466 U.S. 927, 104 S.Ct. 1710, 80 L.Ed.2d 182 (1984) (physician was independent contractor where contract between physician's medical school employer and veteran's administration hospital stated that "[s]uch [medical] personnel shall not be considered VA employees for any purpose."), the court found that the contract strongly indicated that the physicians were independent contractors.

Likewise, in the case at bar, the contract between NES and the United States contains the following key provision:

6. *Relationship of Parties:* It is expressly agreed and understood that the services rendered by [NES] through its employees are rendered in the capacity of independent contractor. Although the Government may evaluate the quality of both professional and administrative services for purposes of contract inspection and acceptance, it retains no control over the services rendered, including, for example, professional judgments, diagnoses, or specific treatments. [NES] shall be solely responsible for any and all liability caused by the acts or omissions, of its agents or employees. (Contract, p. 6–7).

Thus, the NES contract itself strongly indicates that Dr. Beck is an independent contractor.

In *Spitzer,* the Southern District of Georgia also noted that the Medical College contract required that the Medical College and its employees provide their own medical malpractice insurance. This is a strong indication that the party is an independent

contractor rather than a federal employee under the FTCA. *Spitzer*, at 6 (citing *Lurch*, 719 F.2d at 338). A similar provision is found in the NES contract in this case in paragraph I.7: "The contractor shall maintain liability insurance in the amount of not less than $1,000,000.00 per incident during the term of this contract."

Another important aspect of the contract in *Spitzer* was that the Army made direct payment to the Medical College according to a fee schedule rather than to the particular physicians. Moreover, the Medical College directly compensated the physicians for their services. This type of fee arrangement indicates an independent contractor relationship. *Spitzer, Id.* at 7 (citing *Bernie v. United States*, 712 F.2d 1271, 1273 (8th Cir.1983)). Similarly, in the case at bar, the United States made direct payment to NES for the contract while NES compensated Dr. Beck and other NES physicians.

The *Spitzer* contract also expressly provided that the selection of physicians to perform the neurosurgery services at the Army Hospital was to be made by the Medical College. "Independence in fulfilling contractual obligations is demonstrative of independent contractor status." *Spitzer*, at 7 (citing *Lurch*, 719 F.2d at 338). In the same way, the NES contract in this case provides that NES was responsible for selecting and hiring individual physicians to fulfill the contract. Contract, para. I.2.

Therefore, like the contract in *Spitzer*, the NES contract is comparable to typical independent contractor arrangements. However, the Southern District of Georgia in *Spitzer* did acknowledge that the army retained some control over the implementation of the contract:

> For example, there are limitations on the breadth of neurological procedures allowed. There are, as noted earlier, hour requirements and credential requirements, and also quality controls. Additionally, under the contract the government furnished much of the equipment, facilities and support services needed for execution of the contractor's obligations,

and retains administrative and jurisdictional control over the patient. The government also has the right to inspection of the contractor's performance.

*Id.* at 8 (cites omitted). The contract in the case at bar contains the same government controls. *See* Contract, paras. I.2, I.3, I.5, and II.2, Part IV, and I § E.

Nevertheless, as noted by the Southern District, "such control is not substantial enough to bring [Dr. Beck] within FTCA ambit." *Spitzer*, at 8. The government may require the contractor to meet certain standards and may review the contractor's performance to ensure contract compliance without transforming the contractor into a federal employee under the FTCA. *Id.* at 8–9 (citing *Orleans*, 425 U.S. at 815, 816, 96 S.Ct. at 1976, 1977). However, "the real test is control over the primary activity contracted for and not the peripheral, administrative acts relating to such activity." *Id.* at 9 (quoting *Wood v. Standard Products Co., Inc.*, 671 F.2d 825, 832 (4th Cir. 1982)).

In *Spitzer* and in the case at bar the government did not have control over the primary activity contracted for—a physician's medical judgment and professional expertise. In fact, the NES contract expressly provides that "[t]he Government may evaluate the quality of professional and administrative services provided, but retains no control over professional aspects of the services rendered, including by example the contractor's professional medical judgment, diagnosis, or specific medical treatments." Contract, para. I.7. In addition, the NES contract expressly prohibits government supervision and control over NES employees:

> The Government shall not exercise any supervision or control over the Contractor's employees performing services under this contract. Such employees shall be accountable not to the Government, but solely to the Contractor, who in turn is responsible to the Government.

Contract, para. I.H.10.

Therefore, the terms of the NES contract with the United States show that Dr. Beck was an independent contractor rather than

a federal employee. However, the contract terms are not dispositive in determining this question. The court must also examine the facts surrounding Dr. Beck's day-to-day activities at the Moody AFB emergency room to determine if in fact the United States exercised enough control over Dr. Beck to make him a federal employee.

In *Spitzer*, the Southern District found that the Medical College physicians "were completely autonomous in their decision-making and day-to-day performance of the contract." *Spitzer*, at 11. Moreover, the Army Hospital exercised less control over the *Spitzer* physicians than was permitted in the contract.

In the case at bar, there is nothing to indicate that the United States exercised any supervisory authority or control over Dr. Beck other than the minimum controls expressly granted in the NES contract. Dr. Beck followed the prescribed procedures in the NES contract; however, his "judgment was otherwise independent medical." Beck Deposition, at 46. Moreover, no military personnel ever interfered with his medical judgments or diagnoses. Beck Deposition, at 46–47. In addition, while Moody AFB was permitted to review an NES physician's credentials and qualifications and the subjective quality of that physician's performance, the Air Force captain responsible for reviewing Dr. Beck's contract performance never contacted Dr. Beck "with respect to medical care of [individual] patients." Beck Deposition, at 80 and 81. There was never an attempt to tell any NES physician what to do or how to treat patients. Wilds Deposition, at 75–75.

Therefore, as stated by the Southern District of Georgia, Dr. Beck was:

> [I]n respect to the federal government, controlled neither in [his] detailed performance of [emergency] services, nor in [his] day-to-day practice at [Moody AFB].

[He] held and exercised independent discretion in conducting the primary and peripheral duties required under the contract between [NES and Moody AFB]. *Spitzer*, at 17.

He is an independent contractor rather than a federal employee for purposes of the FTCA.[2] Accordingly, summary judgment on all claims related to the conduct of Dr. Beck is GRANTED in favor of defendant.

III. The Remaining Claims

■ In its final supplemental brief in support of its summary judgment motion, the United States contends for the first time that it is entitled to summary judgment in this case on all claims because plaintiff cannot establish proximate cause, an essential element of her claims. The government claims that plaintiff cannot show that an act or omission by the United States was the proximate cause of Mrs. MacDonald's heart attack on January 29, 1992.

This issue is still in dispute in this case, and the court cannot find as a matter of law that the United States' alleged negligence was not the proximate cause of some or all of plaintiff's injuries. Accordingly, the United States motion for summary judgment on all remaining claims is DENIED.

CONCLUSION

The United States' motion for summary judgment is GRANTED IN PART and DENIED IN PART. Summary judgment is GRANTED in favor of the United States on all of plaintiff's claims related to any negligence that allegedly occurred at Hill Air Force Base, Utah, and those claims based upon alleged negligence of Dr. Kevin Beck. Summary judgment is DENIED on all remaining claims.

SO ORDERED.

---

**2.** The court notes that plaintiff also seeks to establish that the United States is liable for Dr. Beck's negligence under state agency law. As the question whether one is a federal employee under the FTCA is a question of federal law, this argument has no merit. *Logue v. United States*, 412 U.S. 521, 528, 93 S.Ct. 2215, 2220, 37 L.Ed.2d 121 (1973); *Spitzer v. United States*, 1988 U.S.Dist. Lexis 1635, at 14–18 (S.D.Ga. 1988).

## CLAIM FOR DAMAGE, INJURY, OR DEATH

**INSTRUCTIONS:** Please read carefully the instructions on the reverse side and supply information requested on both sides of this form. Use additional sheet(s) if necessary. See reverse side for additional instructions.

FORM APPROVED
OMB NO.
1105-0008
EXPIRES 3-31-91

| 1. Submit To Appropriate Federal Agency | 2. Name, Address of claimant and claimant's personal representative, if any. (See instructions on reverse.) (Number, street, city, State and Zip Code) |
|---|---|
| | Debra A. MacDonald<br>1203 Ponderosa Drive<br>Valdosta Georgia  31601 |

| 3. TYPE OF EMPLOYMENT<br>☐ MILITARY  ☐ CIVILIAN | 4 DATE OF BIRTH<br>Dec. 28 54 | 5 MARITAL STATUS<br>Married | 6 DATE AND DAY OF ACCIDENT<br>January 29 1989 | 7. TIME (A.M. OR P.M.)<br>AM |
|---|---|---|---|---|

8. Basis of Claim (State in detail the known facts and circumstances attending the damage, injury, or death, identifying persons and property involved, the place of occurence and the cause thereof) (Use additional pages if necessary)  January 29 1989 I suffered a severe heart attack.  I feel that I would not have had the attack if I had received proper medical care.  In June I had seen Physician assistant Lt. Malcolm for hip pain and a refill on my medication for a hiatal hernia.  He gave me prescriptions for both.  After I had begun to take the new hip medication I began to have strange side effects.  I telephoned Lt. Malcolm and told him.  He told me to discontinue the medication and to make another appointment. On the follow up appointment I told him that the pain in my chest was getting worse and that the medication didn't seem to help at all. He ordered an upper GI series for the pain in

### 9. PROPERTY DAMAGE

NAME AND ADDRESS OF OWNER IF OTHER THAN CLAIMANT (Number, street, city, State, and Zip Code)  NONE

BRIEFLY DESCRIBE THE PROPERTY, NATURE AND EXTENT OF DAMAGE AND THE LOCATION WHERE PROPERTY MAY BE INSPECTED  (See instructions on reverse side.)  NONE

### 10. PERSONAL INJURY/WRONGFUL DEATH

STATE NATURE AND EXTENT OF EACH INJURY OR CAUSE OF DEATH, WHICH FORMS THE BASIS OF THE CLAIM.  IF OTHER THAN CLAIMANT, STATE NAME OF INJURED PERSON OR DECEDENT.
Suffered a severe heart attack resulting in major heart damage, probability of shortened lifespan, and major medical expenses.

### 11. WITNESSES

| NAME | ADDRESS (Number, street, city, State, and Zip Code) |
|---|---|
| Robert C. MacDonald | 1203 Ponderosa Drive Valdosta Ga. 31601 |
| Beverly Steward | 14 Highland Drive Clinton CT 06413 |
| Steven and Valerie Crawford | 1101 Pineview Drive Valdosta, Ga. 31602 |
| Steven and Debra Tielking | Box 4757  APO SF 96366-0006 |

### 12. (See instructions on reverse) AMOUNT OF CLAIM (in dollars)

| 12a. PROPERTY DAMAGE | 12b. PERSONAL INJURY | 12c WRONGFUL DEATH | 12d. TOTAL (Failure to specify may cause forfeiture of your rights.) |
|---|---|---|---|
| NONE | 4,000,000.00 | NONE | 4,000,000.00 |

I CERTIFY THAT THE AMOUNT OF CLAIM COVERS ONLY DAMAGES AND INJURIES CAUSED BY THE ACCIDENT ABOVE AND AGREE TO ACCEPT SAID AMOUNT IN FULL SATISFACTION AND FINAL SETTLEMENT OF THIS CLAIM

| 13a. SIGNATURE OF CLAIMANT (See instructions on reverse side.)<br>Debra A. MacDonald | 13b. Phone number of signatory<br>912-247-4303 | 14 DATE OF CLAIM<br>Jan. 25,91 |
|---|---|---|

| CIVIL PENALTY FOR PRESENTING FRAUDULENT CLAIM | CRIMINAL PENALTY FOR PRESENTING FRAUDULENT CLAIM OR MAKING FALSE STATEMENTS |
|---|---|
| The claimant shall forfeit and pay to the United States the sum of $2,000, plus double the amount of damages sustained by the United States. (See 31 U.S.C 3729.) | Fine of not more than $10,000 or imprisonment for not more than 5 years or both. (See 18 U.S.C. 287, 1001.) |

95-108
evious editions not usable

NSN 7540-00-634-4046

STANDARD FORM 95 (Rev. 7-85)
PRESCRIBED BY DEPT. OF JUSTICE
28 CFR 14.2

EXHIBIT  A

my chest and a Cat Scan for my hip. The next visit I was told the results of my tests showed I did have a hiatal hernia but that it shouldn't be causing me as much pain as I claimed. He told me that I needed to quit smoking, loose weight, and take the tagamet and maalox as I had been. I told him that I was willing to try to quit smoking , but I had reached the point where the slightest exertion caused chest pain and that I just kept on gaining weight. He again told me that he could see no reason for me to be in as much discomfort as I claimed, and said I would probably see great improvement if I quit smoking. He didn't run any other tests and when I still argued that I wouldn't be able to loose any weight if I couldn't exercise due to both chest pain and hip pain he referred me to DR. Kalchek.

When I walked into Dr. Kalchek's office for my appointment he was looking over my records. He looked up at me and said, "I guess Malcolm didn't know what else to do with you " . He never examined me. He then proceeded to tell me the exact same thing that Lt. Malcolm had. I told him that I was indeed already trying all those things and the pain in my chest was getting much worse instead of better, I was still gaining weight, and I felt like I was having mini heart attacks every time I tried to do anything. I told him I couldn't even care for my small child because of the pain. I was nearly in tears asking this man for help. He again told me that there was nothing else he could do for me. I needed to " loose weight, stop smoking and take Tagamet and learn to live with it."

I then tried to do just what they had told me but the pain continued to worsen. My friends and family were concerned but I assured them that the doctors had said it was from my hiatal hernia and that there was nothing that could be done. Since both doctors had told me that I should be able to tolerate it I didn't seek further treatment.

Then on January 29th, I began to have chest pain the same as I had been having for so long but it didn't let up. I tried the Tagamet, I took the maalox, but it didn't help. I waited several hours before I went to the hospital because it was the same pain I had had for so long and I felt it would ease eventually.

When I arrived at the emergency room I could barely stand.

784

I remember seeing an orderly standing there watching my husband almost drag me up the stairs because I didn't have the strength the climb them. He never offered assistance. They then had me lay down while they questioned me and took some vitals. I explained to them that I had a hiatal hernia and the pain was the same as what I had had in the past but it just wouldn't let up. They then had me go down to xray, where I had to stand and undress then move all around while they took xrays. They talked about the possibility of my just being constipated gave me a shot of some kind and were about to send me home. I refused to leave. I told them I was in too much pain to leave. It was then that they decided to hook me up for an echocardiogram. After a telephone consultation with South Georgia Medical Center I was transported and admitted to the intensive care unit for three days.

The doctor treating me at South Georgia ran several tests on me while I was in Intensive care. The tests showed I had suffered a major heart attack. During the thirteen days-I was in the hospital they ran numerous tests. The tests showed I had suffered major heart damage and the doctor said he felt that with the amount of damage I had that I had probably had at least one other attack in the past. They also found that my thyroid was not functioning properly, and that this could possibly been a factor in my weight gain and heart attack.

I feel that the military doctors did not run enough tests on me to find the cause of my pain, and dismissed me, making me feel like a whining hypochondriac so that I did not seek further medical treatment. A simple blood test would probably have shown that my thyroid was not functioning properly, and a stress test would have definately shown a problem.

As it stands now I am a thirty six year old wife and mother of two, with heart damage that has altered my abilities drastically. I face the probability of a greatly shortened life span and major medical expense.

It has only been recently that I have realized that I have legal recourse in this matter and that it would not affect my husband's career. I am therefore seeking compensation for pain and medical expenses, past present and future that I suffered due to the incompetent medical care I feel I received.

Statements from doctors concerning the extent of injury, the treatment and the degree of disability are contained in my hospital records at Moody AFB Hospital. I authorize Moody AFB to examine my records in regard to this complaint.

Debra A. MacDonald  (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)