Beverly **KRAMER**, Plaintiff,

v.

**UNITED STATES** of America, Defendant.

Civ. A. No. 4:93cv00038.

United States District Court,
E.D. Virginia,
Newport News Division.

Feb. 14, 1994.

Debra Irene Johnson, Chandler, Franklin & O'Bryan, Cecil Jerry Franklin, Chandler, Franklin & O'Bryan, Hampton, VA, for plaintiff.

John Phillip Krajewski, United States Attorney's Office, Norfolk, VA, for defendant.

## OPINION AND ORDER

DOUMAR, District Judge.

This matter is before the Court on defendant's motion to dismiss or for summary judgment. Plaintiff claims that the United States is liable for the alleged negligence of several individuals working in the Partnership Clinic at Langley Air Force Base. The United States has moved to dismiss this claim or, in the alternative, for summary judgment on the grounds that these individuals were independent contractors rather than employees of the United States.

By order dated October 20, 1993, this Court granted plaintiff a continuance to submit additional discovery materials in opposition to government's motion. Plaintiff has now filed these materials. Defendant, over plaintiff's objection has submitted a rebuttal brief along with the entire transcripts of the relevant depositions.[1] This motion is now ripe for decision.

### I. Facts and Procedural History

On August 9, 1991, Beverly Kramer, the dependent wife of an enlisted member of the United States Navy, suffered a pathological fracture of her femur. The fracture was apparently caused by a malignant bone cancer. The treatment required the amputation of Kramer's right leg and hip. Kramer was also forced to terminate her pregnancy which was then in the fifth month.

Plaintiff alleges that she consulted various medical personnel during 1990 and 1991 for recurring back and leg pain and that these medical personnel failed to adequately diagnose her condition. In July 1992, plaintiff filed a "Form 95" as required by the Federal Torts Claim Act notifying the federal government of the claim for medical malpractice. The government responded by forwarding its contract with the health care providers who treated Kramer. In order to preserve the related state claim, plaintiff then filed a notice of claim against the health care providers as required by state law.

In January 1993, plaintiff filed a state claim against the medical personnel and "F.G.J. Limited," the entity which employed these personnel. In April 1993, plaintiff filed this claim against the United States of America under the Federal Torts Claim Act. 28 U.S.C. §§ 1346(b), 2671–2680. The same facts provide the basis for both claims.

---

1. Plaintiff objects to defendant submitting a rebuttal brief on the grounds that she has merely submitted the information discussed in this Court's October 20th order. However, plaintiff actually submitted excerpts of the depositions along with six pages of "bullets" which organize and present the information in these deposition excerpts in the light most favorable to the plaintiff. In such circumstances, defendant should be allowed to respond to the characterization of this new evidence. Therefore, the Court will consider all the materials presently before the Court in resolving this motion.

In July 1993, the government filed a motion to dismiss or for summary judgment based on the grounds that F.G.J., Ltd. and its employees are "independent contractors" and that, therefore, plaintiff's claim was barred under the independent contractor exclusion to the Federal Torts Claim Act. 28 U.S.C. § 2671. Shortly thereafter, plaintiff began depositions of the health care providers in preparation for the state court proceeding. Plaintiff claimed that facts discovered during these depositions demonstrated a closer Government role in supervising the medical personnel than was shown by the contract language. By order of October 20, 1993, this Court allowed plaintiff additional time to submit these facts to the Court. The plaintiff has now done so, and the defendant has submitted a rebuttal brief.

## II. Analysis

### A. Standard for Review

Although the government's motion is framed in the alternative as a motion to dismiss or for summary judgment, it most properly is construed as a challenge to this Court's subject matter jurisdiction under Rule 12(b)(1). If the persons in question were independent contractors and not government employees, then the government has not waived its immunity and is not subject to suit in this Court. *See Broussard v. U.S.*, 989 F.2d 171, 177 (5th Cir.1993) (per curiam) ("We note didactically that, as a general rule, whenever the United States has not waived its sovereign immunity, the district court should dismiss the complaint for want of subject matter jurisdiction rather than dismissing by granting a motion for summary judgment."). Review of this motion under Rule 12(b)(1) has two important consequences. First, this Court may consider evidence beyond the scope of the pleadings to resolve factual disputes concerning jurisdiction. Second, dismissal of a claim for jurisdictional defects has no res judicata effect. 2A James W. Moore et al., *Moore's Federal Practice,* ¶ 12.07 (2d ed. 1985 & Supp.1991).

The pending motion pivots on whether F.G.J., Ltd. and certain individual health care providers were "independent contractors" or "employees" within the meaning of the Federal Tort Claims Act, 28 U.S.C. § 2671, at the time they treated the plaintiff. The parties agree that the relevant test to determine whether one is an employee or independent contractor is the "control" test. Though the parties have argued about the characterization of the facts, there is no dispute that the relevant evidence—in the form of the contract, depositions of the relevant personnel, and affidavits—is fully before the Court. The Court must find the relevant facts and apply the law. 2A Moore et al., ¶ 12.07.

### B. The "Control" Test and Medical Professionals

Although the United States is generally immune from suit, plaintiffs may bring actions to the extent permitted under the waiver of immunity embodied in the Federal Tort Claims Act (FTCA). 28 U.S.C. §§ 1346(b), 2671–2680. Most importantly, the FTCA permits suits against the government for the "negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment." 28 U.S.C. § 1346(b). The FTCA defines "employee" as including

officers or employees of any federal agency, members of the military or naval forces of the United States, and persons acting on behalf of a federal agency in an official capacity, temporarily or permanently in the service of the United States, whether with or without compensation.

28 U.S.C. § 2671. However, the definition of "federal agency" explicitly excludes "any contractor with the United States." *Id.*

The Supreme Court has clarified the independent contractor exception in two leading cases. *Logue v. U.S.*, 412 U.S. 521, 93 S.Ct. 2215, 37 L.Ed.2d 121 (1973); *U.S. v. Orleans,* 425 U.S. 807, 96 S.Ct. 1971, 48 L.Ed.2d 390 (1976). In *Logue,* the family of a federal prisoner who hung himself while in the custody of a state jail under contract with the federal government sued the United States under the FTCA. The government, however, successfully asserted that the state prison was an independent contractor to the United States rather than an employee. The Su-

preme Court explained that the FTCA adopted the common law distinction between an employer's liability for his own employees and his liability (or lack thereof) for the employees of a party with whom he contracts for a specified performance. 412 U.S. at 521, 93 S.Ct. at 2219. This distinction, according to the *Logue* court, turns on the absence of authority to control physical conduct. *Id.* Thus, the fact that the government had the right to inspect the prison and demand compliance with various regulations of the Bureau of Prisons did not make the state employees employees of the federal government because the United States had "no authority to physically supervise the conduct of the jail employees." 412 U.S. at 521, 93 S.Ct. at 2220. The *Orleans* court reiterated this holding, ruling that the United States can fix specific and precise conditions to implement federal objectives and can take action to compel compliance with federal standards without making independent contractors into employees. 425 U.S. at 815, 96 S.Ct. at 1976. These rulings gave rise to what is now commonly referred to as the "control" test for determining whether a given individual is a contractor or employee of the federal government.

The Fourth Circuit has elaborated on the requirements of the control test. In *Wood v. Standard Products Co.*, 671 F.2d 825 (4th Cir.1982), the court summarized the Supreme Court's rulings:

> the real test is control over the primary activity contracted for and not the peripheral, administrative acts relating to such activity.

671 F.2d at 831. More recently, in *Berkman v. U.S.*, 957 F.2d 108 (4th Cir.1992), the Fourth Circuit held that writing "sufficient procedural safeguards" into a contract will not convert a contractor into an employee. 957 F.2d at 114. Only when the contractor's "detailed physical performance is subject to government supervision" amounting to day-to-day control over the performance of the

work should a contractor be considered an employee for purposes of the FTCA. 957 F.2d at 113.

Applying the control test to professionals, and especially to medical professionals, under contract with the government presents special problems, as several other circuits have recognized. As the Tenth Circuit once noted in dicta,

> Because a physician must exercise his own professional judgment, no one controls the detailed physical performance of his duties. Given this, by strictly following the traditional control test it is doubtful whether a physician could ever be found to be a federal employee under the FTCA.

*Lurch v. U.S.*, 719 F.2d 333, 339 (10th Cir. 1983), *cert. denied*, 466 U.S. 927, 104 S.Ct. 1710, 80 L.Ed.2d 182 (1984). The *Lurch* court thought it made sense to adopt a modified version of the control test for such professionals, but did not reach the question because they found that the doctor in question could not be found to be an employee given the facts of the case. *Id.* at 339–40. Later, however, the Tenth Circuit retreated from the idea that a modified test was required. In *Lilly v. Fieldstone*, 876 F.2d 857 (10th Cir.1989), the court stated that it is

> uncontroverted that physicians must have discretion to care for a patient and may not surrender control over certain medical details. Therefore, the "control" test is subject to a doctor's medical and ethical obligations.... What we must do in the case of professionals is determine whether other evidence manifests an intent to make the professional an employee subject to other forms of control which are permissible.

876 F.2d at 859. The *Lilly* court then adopted seven factors described in an earlier Tenth Circuit case to guide its evaluation. *Id.* (citing *Norton v. Murphy*, 661 F.2d 882 (10th Cir.1981)).[2] Significantly, however, even before *Lurch* was decided, the Fourth

---

**2.** The seven factors are 1) the intent of the parties; 2) whether the United States controls only the end result or may also control the manner and method of reaching the result; 3) whether the person uses her own equipment or that of the United States; 4) who provides liability insurance; 5) who pays social security tax; 6) whether federal regulations prohibit federal employees from performing such contracts; and 7) whether the individual has the authority to subcontract to others. *Lilly*, 876 F.2d at 859.

Circuit explicitly rejected the argument that some special control test should be applied to medical professionals. *Wood*, 671 F.2d at 831; *see also Broussard*, 989 F.2d at 174–76 (reviewing and rejecting cases calling for a modified control test).

In their memorandum in opposition, plaintiff characterizes this case as one of first impression due to its unique facts, *i.e.*, "a health care professional who was providing medical care to a Plaintiff within a government medical clinic similar contractually to this action." [3] Plaintiff attempts to make her case almost entirely on the facts, arguing that, given the limitations on control imposed by the medical professional's ethical obligations, the government "exercised the maximum amount of day-to-day control over the care and treatment of [patients] without the military command being in the examining room and observing the actual patient/physician interaction."

■ Despite these claims, however, many courts have previously considered whether medical personnel under contract to the government are employees or independent contractors. Furthermore, since this litigation began, the Ninth Circuit has ruled on the employee/contractor distinction in an extremely similar fact situation. *Carrillo v. U.S.*, 5 F.3d 1302 (9th Cir.1993). Consideration of these cases in light of the facts before the Court indicates that the health care providers in this case should be viewed as independent contractors and not employees of the government.

As the *Carrillo* court noted, the circuits are unanimous in holding that contract physicians are independent contractors and not employees. 5 F.3d at 1304. In *Carrillo,* the contractual arrangement was extremely similar to the circumstances in this case. In both instances, a private company was hired to provide personnel to staff a clinic that was physically located within an army medical facility. In both cases, these arrangements were made pursuant to 10 U.S.C. § 1096 which authorizes the Department of Defense to enter into "resource-sharing agreements"

in order to deliver health care "in a more effective, efficient, or economical manner." The contracting health care provider can then receive payments from the Civilian Health and Medical Plan of the Uniformed Services ("CHAMPUS"). *Carrillo,* 5 F.3d at 1303 n. 1; Defendant's Ex. 1 and Attachments, Memorandum of Understanding Between 1st Medical Group and F.G.J., Ltd. and Renewal Agreements. Thus, *Carrillo* strongly supports the government's claim that the health care providers in this case should be considered independent contractors.

The earlier precedents applying the control test to medical professionals also support the government's position. Some of the factors described in *Norton* and adopted by *Lilly* include who pays the social security tax, who pays for liability insurance, and whether the power to subcontract exists. *Lilly,* 876 F.2d at 859. These "factors" appear to be ways of testing whether the contractor is an independent economic entity, and several such indicators are present in this case.

The facts before the Court reveal that the private provider, F.G.J., Ltd., received between 68 and 75 percent of the prevailing CHAMPUS rates for its services. Defendant's Ex. 1 and Attachments. Out of these funds, F.G.J., Ltd. was free to compensate its personnel, including the health providers named as defendants in this case, as it wished. Defendant's Ex. 2, Affidavit of Colonel George D. Belcher, Chief of Hospital Services, Langley Air Force Base. Payment from the government to a health care entity which in turn compensates the individual health care provider on its own terms is an indicator of independent contractor status. *MacDonald v. U.S.*, 807 F.Supp. 775, 780 (M.D.Ga.1992).

By the terms of its agreement, F.G.J., Ltd. was also to provide

full professional liability insurance covering acts or omission of the participating health care entity, as well as those of

---

**3.** The health care professionals named as defendants in this case include both doctors (Martin Luna, Lind W. Chinnery, W.A. Franklin, Jr, and Harold Jones, III) and a physician's assistant (David Dickensheets).

support personnel ... supporting the health care entity ... to the same extent as is usual and customary in civilian practice in the community.

Defendant's Ex. 1, MOU, ¶ B.2.b. The agreement also explicitly excludes "participating health care entities" from a paragraph defining "the hospital's liability for its employees." Defendant's Ex. 1, MOU, ¶ C.7. Again, such an arrangement is a strong indication that the party is an independent contractor rather than an employee. *Lilly*, 876 F.2d at 859; *MacDonald*, 807 F.Supp. at 779–80.

Finally, the contract explicitly addresses the power to subcontract, not forbidding it but only requiring either party's written consent before making any such arrangements with third parties. Defendant's Ex. 1, MOU, ¶ C.1. Such prior written consent is not uncommon in service contracts, and indicates that F.G.J., Ltd. might under some circumstances be allowed to subcontract in order to provide the services to the government. Indeed, F.G.J., Ltd. did have written employment contracts with at least some of the individual health care providers in this case.

All of these arrangements strongly indicate that F.G.J., Ltd. was a separate economic entity under contract to the government to provide medical services, albeit within a government medical facility. The individual health care providers clearly are employees of F.G.J., Ltd. and not the government. Therefore, both F.G.J., Ltd. and the individual health care providers should be considered independent contractors to and not employees of the United States.

The plaintiff stresses the particularly high level of control the government exercised over these medical professionals, contrasting it to the minimal control over the contract physician in *Wood*. Plaintiff is correct that the government played a more significant role in this case than in many of the previously reported cases. The government provided the physical facilities, equipment, and supplies that were used in the clinic, as well as some administrative support. The government owned and controlled the medical records used in treating the patients, and the clinic doctors were required to use govern-

ment forms and followed government protocols in filling out the charts. The doctors at the clinic did not maintain any separate medical records.

However, plaintiff's characterizations of the level of control sometimes go too far. For instance, while plaintiff suggests that the government could monitor the daily activities of F.G.J., Ltd. physicians, the agreement actually provides for monitoring of the performance of "health care entities," *i.e.*, of F.G.J., Ltd. as an entity. Defendant's Ex. 1, MOU, ¶ B.1.a. This fact is also supported by the affidavit of the Chief of Hospital Services which states:

[F.G.J., Ltd. physicians] were completely autonomous from this hospital, including decision making powers as to particular and general care provided to individual patients....

The individual doctors' credentials were subject to review by the hospital, however, the government had absolutely no power to fire an F & G (sic) physician for substandard credentials and could not cause F & G (sic) to fire that physician even if the government wanted to.

Defendant's Ex. 2, Affidavit of George Belcher. The *MacDonald* court rejected a similar claim noting that "while [the government] was permitted to review an NES physician's credentials and qualifications and the subjective quality of that physicians' performance, ... there was never an attempt to tell any NES physician what to do or how to treat patients." 807 F.Supp. at 781.

Perhaps most importantly, plaintiff suggests that a manual prepared by Nurse Green in conformance with government policies essentially dictated the manner in which care was administered. Plaintiff characterizes this manual as effectively insinuating the government's requirements into the day-to-day operations of the clinic. Whether such an indirect manner of control would be legally sufficient is an interesting question, however, the Court need not consider it, because plaintiff's suggestions regarding the manual are not a factually accurate portrayal of the manual or its role in the clinic. The manual was authored by Nurse Green under the

direction of Doctors Franklin and Green (F.G.J., Ltd.'s principals). No government employee was involved in its preparation. Finally, the manual was available at the nurses' station in the clinic but no evidence suggests that it was regularly consulted or otherwise important to the functioning of the clinic.

In conclusion, this Court finds that F.G.J., Ltd. was an independent contractor to the government. The details of the day-to-day work conducted by the health care providers employed by F.G.J., Ltd. were not sufficiently controlled to be considered employees for the purposes of the FTCA. *See Carrillo,* 5 F.3d at 1305 (because the government did not have any control over the doctor's actions in diagnosing and treating patients, the doctor was not an employee of the government); *MacDonald,* 807 F.Supp. at 781. To the extent that the requirements of medical ethics may prevent courts from ever finding that the government controlled a doctor's actual treatment of patients, however, it may be more fruitful to focus on the economic relationship between the doctor and the government. In a case such as this, where a separate economic entity hires and pays the doctor's salary and provides insurance for the doctor, it seems clear that the government and the contractor intended that any liability should be borne by the separate entity and its employees. *See Sneed v. U.S.,* No. 91–0613–FMS, 1992 U.S.Dist. LEXIS 19165 (N.D.Cal. Nov. 23, 1992) ("The government has a right to receive the benefit of its bargain with [a doctor hired as an independent contractor] ... [The government] is entitled to shift the risk of loss from claims or liability associated with work performed by [the doctor] from itself to [the doctor].").

## C. Estoppel

Plaintiff also argues that the government should be estopped from raising the independent contractor defense because the government allowed the clinic to be operated in such a manner as to give the appearance that it was a military-run government facility. Based on the evidence presently before the Court, it is true that the facility appeared to be a government-run clinic. The clinic was physically located within the First Medical Group facility. There were apparently no signs posted nor any special designation on the forms to be filled out and signed that would indicate that the patient was being treated by civilian employees. Uniformed personnel apparently worked in or near the same areas. Patients could check in through the same receptionist and were required to show military dependents' identification to receive treatment.

■ However, in order to assert estoppel against the government, the plaintiff must show more than this. To establish a claim of estoppel, the plaintiff must show

(1) the party to be estopped must know the facts; (2) he must intend that his conduct will be acted upon or must so act that the party asserting the estoppel has a right to believe it was so intended; (3) the latter must be ignorant of the true facts; and (4) he must rely on the former's conduct to his injury.

*Lurch,* 719 F.2d at 341 (citing *Home Savings & Loan Ass'n v. Nimmo,* 695 F.2d 1251, 1254 (10th Cir.1982)). Thus, in addition to the fact that the government appeared to be running the clinic, the plaintiff must show "affirmative misconduct" on the government's part as well as "reliance" on the plaintiff's part. *Furcron v. U.S.,* 626 F.Supp. 320, 323 (D.Md. 1986) ("government acts or misrepresentations inducing reliance must be 'affirmative misconduct' ").

Plaintiff relies on *Gamble v. U.S.,* 648 F.Supp. 438 (N.D.Ohio 1986). In that case, the district court by-passed the control test inquiry and instead defined "the essential question" as whether the government "may insulate itself by contractual arrangement from liability for acts of medical malpractice" by a doctor practicing at a VA hospital. *Gamble,* 648 F.Supp. at 441. The *Gamble* court reasoned that the government's consent to the doctor holding himself out as a VA physician and the VA holding itself out as a "full service" hospital constitute affirmative acts by the government that engendered reliance by the plaintiff. On similar facts, another district court found that the government was estopped from denying liability, but recognized that "in accepting this theory,

we may well be creating an exception to the rule that" the government is not liable for the acts of independent contractors. *Utterback v. U.S.*, 668 F.Supp. 602 (W.D.Ky.1987), *compare Furcron*, 626 F.Supp. at 323 ("applying the estoppel must not threaten the public fisc or upset public policy if extended to like cases").

The *Carrillo* court disagreed with *Gamble* and *Utterback*, holding that these cases "confuse affirmative action with affirmative *misconduct*." 5 F.3d at 1306 (emphasis in original); *see also INS v. Miranda*, 459 U.S. 14, 103 S.Ct. 281, 74 L.Ed.2d 12 (1982) (per curiam). Similarly, in *Lurch*, the court refused to find affirmative misconduct where the government's only action was a "failure to have observable differences between physicians employed by the V.A. and employees of independent contractors." *Lurch*, 719 F.2d at 340. While this Court tends to agree with the *Carrillo* and *Lurch* courts' explication of the affirmative misconduct requirement, this Court need not enter into this debate, because even if the government's actions were enough to amount to "affirmative misconduct," the plaintiff has still failed to demonstrate that she relied on the government's conduct to her detriment nor that she had a right to rely on the government's conduct. *Broussard*, 989 F.2d at 177 ("At a minimum, the government would have to engage in affirmative misconduct before it could be estopped, and even then affirmative misconduct may not be sufficient.").[4]

An essential element of any estoppel claim is that the party asserting estoppel must have relied on the misrepresentation or concealment to its detriment. *Carrillo*, 5 F.3d at 1306; *Lurch*, 719 F.2d at 341. However, there is no evidence nor even any allegation that plaintiff would have sought treatment elsewhere or otherwise changed her actions in seeking medical treatment if she had known that the doctors were employees of F.G.J., Ltd. and not the United States government.

Plaintiff does hint that there may be limitations problems with her state claims. Claimants raising estoppel against the government often assert that their reliance on the availability of the United States as a defendant led them to fail to file their other claims against the defendants in a timely fashion. In her memorandum in opposition, plaintiff states that when she learned in September of 1992 that the Partnership Clinic was maintained by an independent contractor, she filed "out of an abundance of precaution" a Motion for Judgment against the health care providers in state court. She notes, without commenting, that these defendants raised the defense of the statute of limitations.

Even if plaintiff were barred from bringing her claims in state court,[5] however,

---

4. Neither party points to any Fourth Circuit authority on this issue, or even on the more general issue of estoppel.

5. As a factual matter, any reliance induced by the federal government was cured as of September 2, 1992, when the government informally notified plaintiff that the doctors in question were not employees of the United States Government. Plaintiff filed a "Standard Form 95" (an administrative prerequisite to an FTCA claim against the government) informing the government of her claim for medical malpractice on July 23, 1992. Although the government did not officially deny her claim until June 29, 1993, the government informally alerted plaintiff to the health care providers' independent contractor status on September 2, 1993. Accordingly, plaintiff could have brought a claim in state court at that time, and did file a notice of claim a few weeks later on September 23, 1992, when she filed a "Notice of Claim" against the health care providers under Va.Code § 8.01–581.2. Subsequently, on

January 20, 1993, plaintiff filed a lawsuit against the health care providers in state court.

Virginia follows the continuing treatment rule. Under that rule, where there is an ongoing physician-patient relationship in which the patient was treated for the same or related ailments over an extended period of time, the statute of limitations for any negligence that occurred during that treatment does not begin to run until the end of that treatment. *Grubbs v. Rawls*, 235 Va. 607, 613, 369 S.E.2d 683, 687 (1988) (explaining the *Farley–Fenton* continuing treatment rule). The statute governing this claim provides for a two year limitation. Va.Code § 8.01–243. Therefore, plaintiff appears to have timely filed for any negligence that occurred within the course of treatment ending no later than September 23, 1990. It also appears that at least some of the defendants did treat the plaintiff after this time. Of course, this Court is not ruling on these issues in any way as they are matters for the state court to decide. This discussion is only intended to illustrate that, as a factual matter, any reliance

this would not be grounds for asserting estoppel against the government. In *Lurch,* plaintiff claimed that, relying on the fact that the government was amenable to suit, he failed to file a suit in state court and was now barred from doing so by the statute of limitations. In that case, the government answered a FOIA request related to the plaintiff's case "admitting" that "surgery was performed by certain physician's employed by and on the staff of the [VA hospital]." 719 F.2d at 340–41. However, the court found that this admission and other circumstances indicating that the physician was a government employee did not amount to a showing that the government intended the plaintiff to rely on these representations in the tort litigation. *Id.* Similarly, in an unpublished opinion from a district court in Pennsylvania, the government sent out a letter denying the existence of an FTCA claim [6] without explaining that the allegedly negligent personnel were actually government contractors. That court found that the plaintiff was under a duty to investigate who to sue, and that the government's omission, "even if intentional," was insufficient to abrogate this duty. *Wollaver v. U.S.,* No. 89–0772, 1989 WL 83485, *4, 1989 U.S.Dist. LEXIS 8433, *9–10 (E.D.Pa.1989). Clearly in this case, where the government came forward just six weeks after the suit was filed and notified the plaintiff that the health care providers at issue were independent contractors, the government can not be found to have intentionally induced reliance on the status of these individuals. Accordingly, this Court holds that plaintiff has not shown any intent of the government to induce reliance nor any detrimental reliance sufficient to estop the government from raising the independent contractor defense.

### D. Failure to Supervise

██ Plaintiff's final theory for proceeding against the government is a negligent failure to supervise the health care providers. However, no evidence or allegations indicate that

government personnel were involved in supervising the medical care dispensed by these health care providers in anything but the most general and detached manner. Nor does plaintiff cite any authority establishing the existence or extent of such a duty to supervise. This Court holds that the government is not liable under this theory.

### III. Conclusion

In conclusion, this Court HOLDS that F.G.J., Ltd. and its employees were independent contractors for purposes of the FTCA. Therefore, this Court has no jurisdiction over any claims against these health care providers and those claims are DISMISSED pursuant to Federal Rule of Civil Procedure 12(a)(1). Furthermore, this Court HOLDS that plaintiff has failed to establish grounds for equitably estopping the government from raising this defense. Finally, this Court HOLDS that the government may not be liable under a theory of negligently supervising these health care providers.

The Clerk of the Court is DIRECTED to forward copies of this order to counsel for the parties.

IT IS SO ORDERED.

---

plaintiff may have placed on the government does not appear to have worked to plaintiff's detriment.

**6.** This letter was probably very similar to the letter attached as Exhibit 2 to Plaintiff's Memorandum in Opposition, which indicates that the claim is denied without stating the grounds for the denial.